ROSA STEWART JOHNSON, Appellee, v. E. G. TYLER et al.,
Appellants.

**DEEDS:** Action to Set Aside—Fraud—Degree of Evidence Neces-
1 sary. To impeach a solemnly executed deed to real estate on the
ground of fraud, the testimony must be clear, satisfactory and con-
vincing, and something more than a bare preponderance in the
balancing of probabilities. Evidence reviewed, and *held* insufficient
to justify the order of the lower court annulling a deed.

**FRAUD:** Fiduciary Relation—Action to Set Aside Deed—Evidence—
2 Sufficiency. Evidence reviewed, and *held* wholly insufficient to set
aside a solemnly executed deed on the ground of fraud growing out
of alleged fiduciary relations.

**DEEDS:** Action to Set Aside—Inadequacy of Consideration. Inade-
3 quacy of consideration is not, of itself, ground for setting aside a
deed.

*Appeal from Harrison District Court.*—THOMAS ARTHUR,
Judge.

MONDAY, APRIL 10, 1916.

ACTION in equity to set aside a conveyance on the ground
of fraud. The opinion states the case. Decree for the plain-
tiff in the court below. Defendants appeal.—*Reversed.*

*Roadifer & Roadifer,* for appellants.

*J. A. Murray,* for appellee.

GAYNOR, J.—This is an action in equity to set aside a
quitclaim deed given by the plaintiff to E. G. Tyler. The
relief prayed for is grounded upon alleged fraud, mistake and
undue influence practiced upon the plaintiff
by the said E. G. Tyler, to induce the execu-
tion of the deed. Hattie P. Tyler is the wife
of E. G. Tyler, and it is alleged that, after

1. DEEDS: action
to set aside:
fraud: degree
of evidence ne-
cessary.

the making of the deed by the plaintiff to the defendant E. G. Tyler, he conveyed the premises to his wife, for the purpose of hindering, delaying and defrauding his creditors, and especially to hinder, delay and defraud this plaintiff, and it is asked that such conveyance be set aside. In the hearing below, the relief prayed for, as against the defendant E. G. Tyler, was granted, and such deed canceled, set aside, and held for naught. From this, the defendant E. G. Tyler appeals. No decree was entered touching the deed executed by E. G. Tyler to his wife, the other defendant, but judgment was entered against both defendants for costs, and both appeal. As to the devolution of the title of the property in controversy, it appears that Frederick Geith, during his lifetime, was the owner of this property; that, when he died, he left a will, which was duly probated. By its terms, he gave to his wife, Mary Geith, who survived him, a life interest in the property, and to his children the remainder, share and share alike. That the plaintiff is the only daughter of Lizzie Geith Stewart, one of the children of the said Frederick Geith, and as such, under the will, took the interest of the said Lizzie, and became invested with a one-eleventh interest in the entire estate, subject only to the life estate vested in the wife of the said Frederick Geith. The property consisted of the E ½ of the NE ¼ of Sec. 3, Twp. 79, Range 43, Harrison County, Iowa.

Frederick Geith, the original owner of said land, died about 16 years prior to the commencement of this suit. Mary Geith, his wife, who was the life tenant, died on or about August 29, 1912. Upon her death, the plaintiff became entitled to an undivided one-eleventh interest in the above described premises, and was, at the time of the making of the deed, the owner of an undivided one-eleventh interest in said real estate. The deed to set aside which this action was brought was executed on the 16th day of November, 1912. The plaintiff received $100 from the defendant as a consideration for the execution of the deed. Prior to the time of the execution of the deed, she had mortgaged her interest in the

property to Lloyd Fallon for $120, and this was a subsisting lien upon her interest in favor of Fallon at the time of the making of the quitclaim deed.

The grounds upon which the plaintiff seeks to have the deed set aside are:   That the defendant E. G. Tyler represented to her that her grandmother, Mary Geith, the life tenant, was still living at that time, and that plaintiff's interest was contingent and remote, and that her enjoyment of her interest was likely to come so far in the future that it was of little value; that, in truth and in fact, the life tenant had died nearly two months before the quitclaim deed was procured, and plaintiff had become and was the absolute owner in full of the interest hereinbefore set out; that her interest was of the value of $700, and that the consideration paid was grossly inadequate; that she did not know, at the time, that the life tenant was dead, and did not learn of that fact until long afterwards; that, at the time of the execution of the deed, she was acting under a misapprehension both of fact and of law, and that, if she had known that the life tenant was dead, and that she had become invested with the legal title to her interest as devisee, she would not have made the deed; that the defendant did know this fact; that he represented himself to be a lawyer; and that he concealed both the death of the life tenant and the legal effect of the death upon plaintiff's rights, knowing that she was laboring under a misapprehension touching the same.   Plaintiff further says that she relied entirely upon the knowledge and integrity of the defendant in signing the quitclaim deed; that she was unable to read intelligently enough to inform herself as to the character of the instrument that she was signing, and did not understand the nature and extent of the property which the instrument purported to convey; that the defendant knew the extent of her interest at the time of the making of the deed, and the value of such interest, and knew that plaintiff was reposing confidence in him, in his statements, and in his knowledge touching the matter.

The defendant Tyler admits all the facts touching the devolution of the title of the property, and that plaintiff made him a quitclaim deed of her interest therein; denies that she was unable to read intelligently and understand the nature and character of the instrument that she signed; denies that he made any statements to her such as are alleged by her; denies that the consideration was grossly inadequate; denies that plaintiff did not know of the death of the life tenant before the making of the deed; denies that any fraud or undue influence was practiced upon the plaintiff to induce her to execute the deed; denies that she was laboring under a misapprehension of any fact touching her right in the property in controversy, at the time that the deed was made.

Plaintiff testifies that she is 33 years old; that she resided in the vicinity of this property until she was 12 or 13 years old; that she first met the defendant Tyler at Omaha, at some place where she was working; that she learned that he was from Logan, and she there discovered who he was, and he there discovered that she was also from Logan; that he asked her if she knew anyone in Logan; that she said that she knew Lloyd Fallon to a certain extent; that she told him that she had done some business with Fallon and that he had been unfair to her, and he remarked that he would look into it; that he came back in about a week after that and told her that he was an attorney, and that he had some trouble with Fallon; that he would give her $100 for a quitclaim interest in the property; that that was the only way that she could get even with Fallon; that she asked him if her grandmother, the life tenant, was still living, and he said, "Yes," she was living with Ed on a farm; that he told her that, if she would sign the deed, he would give her $100, and he would make $150 out of it himself. Plaintiff further testifies:

"I didn't know at the time I signed the deed that my grandmother was dead. I knew I was entitled to a one-eleventh interest. I knew when my grandmother died I would

get some money.  I knew that when she died I would get my
mother's share—a one-eleventh interest.''

She further testifies that she had lived with her grand-
parents, the Geiths, until she was about 11 or 12 years of age,
and knew something about the land; that she went to school
until she was 14, when she went to Missouri Valley; that she
went to Omaha when she was about 17; that she married a
man in Sioux City by the name of Johnson; that he got a
divorce from her, but she does not know when.  She further
testified that she was subsequently married to a man by the
name of Pierson; that she always went by the name of Laura
Holmes.  She said that she went by that name when she was
living with her first husband, and has gone by that name since
her last marriage; that she was last married about two years
before she testified.  She says that she does not remember the
date on which she married her last husband; thinks it is about
two years ago; that she was not married to this last man at
the time of the making of the deed.  She testified:

''I acknowledged the deed before a notary public.  I can
read.  I glanced at the deed, but did not read it thoroughly.
I first learned of my grandmother's death when I called my
uncle over the phone after there was an advertisement in the
Omaha paper for me.  My folks did not know where to find
me.  This was about a week or three or four days after the
deed was made.  My uncle made all the arrangements about
commencing this suit.  I guess I have told all the state-
ments that Mr. Tyler made to me that induced me to sign the
deed.  I don't know whether the mortgage to Fallon is paid
yet or not.''

This is all the testimony given by the plaintiff bearing
upon this question, and all the testimony offered by her touch-
ing the execution of the deed.

The testimony for the defendant was substantially as fol-
lows:  The notary before whom the deed was acknowledged
testified that he asked the plaintiff if she knew the contents

of the deed when she signed it, and she answered, "Certainly;" that, before he took the acknowledgment of the deed, he went to get his notarial seal; that, when he came back, she had the deed in her hand, and had it open, and she laid it back on the table when he came in.

Mrs. A. J. Carey, called for the defendant, testified that she lived in Omaha; was acquainted with the plaintiff; that the plaintiff goes by the name of Holmes; that she had known her about four years; that she knew Tyler; had some business with Tyler; that is, he attended to some business for her; that she talked with the plaintiff about disposing of her interest in her grandmother's estate; that, when she came home, after executing the deed, she told that she had gotten $100; that she asked her why she didn't get more. She answered:

"My folks have never done anything for me—just kicked me around, and I just beat them to it. I would have sold it for less just to beat them to it."

That, when the plaintiff saw the advertisement in the paper to which she refers, she remarked:

"What do you think of the nerve; because I have disposed of the land, they want to try to get it back."

She further testified:

"I heard Tyler and the plaintiff talk about the transaction before the deed was made. He told her about her grandparents. He said her grandparents were dead. She told him who her grandparents had been living with—a couple of sons. I heard him tell the plaintiff that he was an abstracter."

Letters were introduced by the defendant written by Fallon to the plaintiff, from some of which it appears that she had been seeking to sell her interest in the property as early as 1902. A letter written by Fallon on November 10, 1902, reads:

"Replying to your favor of November 4th relative to the interest you have in the 80-acre tract of land belonging to your grandfather's estate, will say I am not in a position to buy any part of it at this time. It is worth more than $150 now,

perhaps twice that amount, but no one can tell on account of your grandmother's death, as I have told you before. She holds it as long as she lives, then it can be sold and divided, and not until then. You should not want to sell it now, but hold on to it, then you will be able to get more out of it."

In 1903, she sought to obtain a loan from Fallon of $35 and secure it on the land. He wrote her that he could not make the loan, but would try to induce her uncle to purchase her interest for $250. In March, 1904, he wrote her that he had made the proposition to the uncle, and that the uncle had turned it down. He then advised her to let the matter stand until her grandmother's death, and then she would get her share.

The defendant testified that he met the plaintiff in Omaha, as testified to by her; that she was going by the name of Laura Holmes; that he had a conversation with her touching the property before the day that the deed was executed; that he was engaged at that time in ferreting out for Mrs. Carey her ownership in certain property in New Hampshire, Massachusetts; that the plaintiff then told him that she was from Harrison County; that he went down to Omaha on the 16th day of November, and had a conversation with her touching the purchase of this land; that she asked $50, said that she would rather have $50 then than $500 a few years later; that, after he investigated, he went down there on the 16th; that they went to a restaurant and had supper, and talked over the proposition; that the conversation was a continuation of the conversation started on the Wednesday preceding; that she told him that she was entitled to a one-eleventh interest now that the old lady was dead; that he asked her about claims against the estate, and also if she was married; that she said she was unmarried; that, when he met her on the 16th, he was prepared to accept her proposition; that he showed her the deed, and she read it over; at least, took time enough to read it over; that thereafter they executed the deed, and he gave her $60 in money and a check for $40; that, in the conversa-

tion had, she told him that her mother was dead. This was in the first conversation.

"She asked me where her grandmother was buried, and I told her if she wanted to know I would find out. I never told her that her grandmother was still living. At the time I bought the land it was worth, in my judgment, not to exceed $65 an acre. I told her her grandmother died in August preceding."

The quitclaim deed in controversy contains this provision:

"I hereby quitclaim my interest in the estate of Frederick Geith and Mary Geith, who were my grandparents, and my interest in the real estate of which they died seized." (Here follows a description of the real estate.)

It contains also the provision:

"All claims of equity I may have or hereafter acquire therein, and against one L. W. Fallon, of Logan, Iowa, who acted as attorney in the first of said estate."

And the further provision:

"I covenant with the grantee herein that my mother, Eliza Stewart, the wife of William Stewart, was a daughter of said Frederick Geith and Mary Geith, his wife; that my said mother died before the death of her parents, and left no heir or heirs other than myself."

The only testimony as to the value of the land, other than the testimony of the defendant, herein set out, was given by the plaintiff's uncle, who testified that the reasonable market value of the land on November 16, 1912, was around $100. On cross-examination, he said that it sold at the referee's sale in 1914 at $92.50; that land in that vicinity went up during the years 1912 and 1913; that, during the years 1912 and 1913, land in that vicinity advanced all the way from $10 to $20 an acre.

Lest it be thought that in setting out the testimony of Mrs. Carey we have overlooked the cross-examination appearing in the amendment to the abstract, we will say that there is nothing in this cross-examination that militates against the

statements made by her on direct examination.   It only indicates the hedging of the woman's mind against the imputation of being over-curious, prying or inquisitive, and detracts nothing from the statements originally made in her direct examination, as hereinbefore set out.

The only question raised involves the sufficiency of the evidence to justify the court's decree.   The case is triable *de novo* here.   We have read the record with care.   All facts material to this controversy, disclosed by this record, are set out.

There are only two facts that the evidence of the plaintiff tends to show, upon which she predicates her right to the relief prayed for:   (1) That the defendant stated to her that her grandmother was still living; that her available interest was contingent upon the death of her grandmother; that she did not know this fact.   (2) That the consideration was grossly inadequate.

That the plaintiff knew the character and location of the property conveyed and her exact interest therein, this record discloses without any controversy.   That she knew that she would own an undivided one-eleventh interest in the property in the event of her grandmother's death was also well known to her at the time.   That the grandmother had a life interest in the estate which would terminate upon her death was also known to her.   That, upon the death of her grandmother, the one-eleventh interest would become vested absolutely in the plaintiff was known to her.   She had some information touching the value of her interest in the real estate.   She had corresponded with Fallon touching this fact, and had some information on that point.   That she was anxious to realize her interest in this property and convert the same into money as soon as possible is made manifest by the record.   She claims that she was deceived by the defendant concerning her grandmother's death.   She affirms that he told her that her grandmother was not dead, and that the enjoyment of her estate, or any realization therefrom, might be far in the future.   This

is the real ground of her complaint. This is the real basis of her action to set aside the deed. The burden was on her to establish it. Fraud is never presumed.

The deed was presented to her before it was signed. She could read. She had it in her possession with every opportunity to know its contents. She was not circumvented in any way. She says that she glanced over it. The notary testified that she said that she knew its contents before she signed it. She did sign it and acknowledged it, before the notary, to be her voluntary act and deed. There is no direct evidence of fraud, except the testimony of this complainant. She was 33 years of age; possessed ordinary intelligence; could read. She had been out in the world of men and things on her own resources for many years. The testimony discloses that she had offered the land on the Wednesday preceding the execution of the deed; that she wanted plaintiff to take it on that day; that he did not know who she was until he investigated, except from what she said; that he did not make her any offer on that day; that she spoke about it and wanted to sell it; that, after he had investigated and found out who she was, and that she was what she claimed to be, he came back to Omaha, and the deal was made.

The defendant testified, and plaintiff did not go on the stand to contradict him, that, before the deal was consummated, he advised her to write to an attorney; suggested Mr. Bolton, Mr. Fallon or Mr. Roadifer; that she said that she would not have anything to do with an attorney. He testifies:

"I suggested that she give power of attorney to me, but she said she wouldn't trust any man. She wanted me to make her an offer that day, and I did."

It is elementary that, in the absence of corroborating evidence or circumstances, a court is not justified in overturning a legal title, solemnly conveyed by written instrument, duly executed and acknowledged, upon the testimony of a single witness, when that witness is contradicted by the testimony of another equally credible, as to the existence of all facts

alleged and relied on as a ground for granting the relief prayed for. It is also well settled that courts will not grant relief on the ground of fraud, unless the fraud alleged and relied upon, which, if proved, would justify the court in granting relief, is established by clear, convincing and satisfactory evidence. See *Epps v. Dickerson*, 35 Iowa 301; *Ley v. Metropolitan Life Insurance Co.*, 120 Iowa 203. See *Schrimper v. Chicago, M. & St. P. R. Co.*, 115 Iowa 35, in which it is said:

"To justify a decree setting aside or reforming a deed because of the alleged fraud, the evidence must be clear and satisfactory. A mere preponderance of the evidence is not sufficient. Any other rule would be highly dangerous, and tend to weaken confidence in all titles."

This rule is so elementary that we need cite no further authorities in support of it.

The plaintiff and defendant were not on unequal ground. They were dealing at arm's length. No fiduciary relation existed, nor is there anything to suggest that the plaintiff reposed any special confidence in the defendant, or had a right to do so. He was a total stranger to her, and there is nothing to show that he sought to or did gain her confidence, or that he played upon her credulity. There is no evidence that the plaintiff was mentally weak, or incapable of taking care of her own end of the deal. The contract is not unreasonable. Mere inadequacy of consideration is not ground for setting aside a conveyance. Whether she read the instrument or not is wholly immaterial to this investigation.

2. FRAUD: fiduciary relation: action to set aside deed: evidence: sufficiency.

3. DEEDS: action to set aside: inadequacy of consideration.

She agreed, and it was her intended purpose, to convey her interest in this real estate to the defendant for the consideration offered. She signed and acknowledged the deed for that purpose. In the absence of clear and satisfactory evidence that she was induced to make the deed by and through fraud charged to have been used by the defendant, the deed is binding upon her.

We reach the conclusion, after a careful consideration of the whole record, that the decree of the district court was without support in the evidence, and that plaintiff's petition should have been dismissed, and the case is therefore reversed and remanded, with instructions to enter a decree conforming to this opinion.—*Reversed* and *Remanded.*

EVANS, C. J., LADD and SALINGER, JJ., concur.