JOE KILBY, Appellant, v. CHARLES CITY WESTERN RAILWAY COMPANY, Appellee.

RELEASE: Ineffectual Impeachment. A release and settlement of an unliquidated claim, entered into by one who, while confined to his bed, was in full possession of his faculties, and after ample legal advice and consultation with relatives and friends as to the advisability of a settlement, may not be overthrown by a showing that the agent who secured the settlement objected, when the settlement was made, to the presence of attorney for claimant, and enlarged on the possible duration of the litigation in case no settlement was made.

*Appeal from Floyd District Court.*—C. H. KELLEY, Judge.

JUNE 25, 1921.

ACTION to recover damages for personal injury. Directed verdict for the defendant. Plaintiff appeals.—*Affirmed.*

*Jens Grothc* and *H. J. Fitzgerald,* for appellant.

*Henke & Lovrien* and *Chandler Woodbridge,* for appellee.

FAVILLE, J.—The appellee operates an electric railway between the towns of Marble Rock and Charles City in this state. In October, 1919, the appellant was a brakeman in the employ of the appellee. The train crew consisted of a conductor, a motorman, and the appellant, and they were in charge of a freight train. The crew made the trip from Charles City to Marble Rock and return. On the evening of October 4, 1919, between 11 and 12 o'clock, they left Marble Rock for Charles City. About midway between Marble Rock and Charles City is the station of Oakwood. Some distance outside of Oakwood the train was stopped, and the motor proceeded to Oakwood with two cars of tile, which were placed on the siding on the southeast side of the main track, or on what would be the right side in the course in which the train was moving towards Charles City. The two cars and one other were left together on the siding near the switch. After so doing, the motor returned to the train and was attached, and proceeded down the main track toward Oakwood. There was a considerable upgrade between the place where the train had been left and Oakwood. The track was slippery, and the automatic sander on the motor seems to have been out of order. The motorman told the appellant that it would be necessary to sand the rails by hand. The appellant went out on the running board on the right-hand side of the motor with a pail of sand, a lantern, and a fire shovel, and the train started toward Oakwood. In the meantime, the cars that had been left on the side track at Oakwood had escaped from the siding, and had run down an incline of the track onto the main line. The motor and the cars it was pulling came down the main line at a speed of about 40 miles an hour, and a collision occurred between the motor and the cars that had escaped from the siding. The appellant was caught between the motor and the cars, and received the injury to recover for which this suit is brought.

The appellant was taken to a hospital, where an operation was performed upon him. Later this action was begun; and,

while the action was pending, he made a settlement with a representative of the railway company, and received the sum of $2,627.50 in cash, and medical and hospital expenses amounting to $372.50, and executed to the appellee a full and complete release in writing. The suit was thereafter tried. Said release was pleaded as a complete defense, and the appellant by reply alleged that the said release was executed at a time when he was physically and mentally incompetent to transact business, and was obtained by reason of misrepresentation and fraud. At the close of the testimony for appellant, the court directed a verdict in favor of the appellee. The motion for directed verdict was based on a number of grounds.

I. The first question for our consideration is whether or not the appellant is bound by the settlement and release which he made. It is conceded that the appellant signed the release offered in evidence, and received the amount agreed upon as damages. The question upon this branch of the case is whether or not the release was obtained from the appellant at a time when he was physically and mentally incompetent to execute the same, and whether it was procured by false representations and fraud.

The rules of law pertaining to the validity of a settlement and release have been before us frequently, and are well established. The difficulty lies in the application of the rules to the facts of any particular case. Where a settlement has been had between competent parties, and a release has been fairly entered into, without fraud or overreaching, it becomes binding and effectual, and will be upheld and enforced. It is undoubtedly the law that an instrument of this character can be impeached for fraud in procuring the same, or where the same was executed by a party who was mentally incompetent to legally execute such an instrument. The burden of proof is on the party seeking to impeach such written instrument. These propositions of law have been recognized by us and applied in *Kilmartin v. Chicago, B. & Q. R. Co.*, 137 Iowa 64; *Johnson v. Berdo*, 131 Iowa 524; *Johnson v. Chicago, R. I. & P. R. Co.*, 107 Iowa 1; *Nason v. Chicago, R. I. & P. R. Co.*, 140 Iowa 533; *Blossi v. Chicago & N. W. R. Co.*, 144 Iowa 697; *Douda v. Chicago, R. I. & P. R. Co.*, 141 Iowa 82; and other like cases.

It will be necessary for us to briefly review some of the salient facts in the case. The appellant was an unmarried man, about 30 years of age. Immediately after the accident, he was removed to a hospital at Charles City, where he was operated upon the following morning. The appellant testified that he got to feeling fairly well after said operation; that, some 3 to 5 days after the accident, he met a Mr. Walters at the hospital, who asked him about how the accident occurred. At that time, the appellant did not know that Walters was an adjuster for the appellee company. The appellant explained to him how the accident occurred. He did not see Walters again until the forenoon of November 5th. At that time, appellant was sitting up in bed. Walters suggested that they talk about a settlement for the insurance company. Another patient, a Mr. Dugan, was in the same room with the appellant. At that time, appellant told Walters that he would give him no answer about a settlement; that he would rather have his attorney come. Walters told him that he did not need his attorney, and left. That afternoon, Walters and the attorney met at the hospital, however, and had a talk in the hall, and afterwards went in the room where the appellant was, and Walters said to the appellant: "You are wanting quite a sum, $11,000." He offered to pay $2,400, and the appellant said "No." The next day, this suit was started.

The appellant testified that, after this talk about a settlement, he talked with a Mr. Ernsberger, to whom he said that he might settle, if he could settle right. Appellant left word with the doctor to tell Ernsberger to come and see him. Ernsberger was the general manager of the railway company. Ernsberger did so, and appellant told Ernsberger that he would settle if Ernsberger would send a man to him that would settle right, but that he did not want Walters to come, if he could not pay more than he had offered. On November 18th following, the appellant underwent a second operation, at which time he was put under an anæsthetic. This was on Tuesday. Appellant says that he was weak on the following day, Wednesday, and that the next day, Thursday, Walters came to his room with the attending physician, and stayed for probably half an hour. Appellant says that Walters told him that he came to settle with him, and that he could not have his attorney there, and

asked appellant if his folks were in town; that he said he would
be up the following morning, between 9 and 10 o'clock, to settle
with him.   Appellant testified that Walters told him that it
was a good thing for him to settle; for, if he would go to law,
by the time he got through the courts, he would have less money
than he was giving him.  He also testified that Walters told him
that the case was covered by the state law, and not by the Fed-
eral Liability Act.  The appellant's father and stepmother were
sent for, and came the next day, about 9 o'clock, and Walters
came at about 10.   The appellant testified that Walters then
said that it was a good thing for him to settle; that, by the time
he would get through court, he would have less money than was
offered him; and that it would take from 3 to 5 years before he
could collect any.  Appellant said he would have to have money
to pay his doctor and hospital bill, and Walters said he would
pay the bill.  Appellant testified that Walters told him to think
it over, and that Walters went out of the room, and remained
for some 15 or 20 minutes.  He says that Walters told him that
the railway was not engaged in interstate commerce, and that
appellant could not recover under the Federal Liability Act.
He said Walters figured up, and told him that the amount he
was entitled to recover was $2,627.50; that that was all the state
law allowed, and all he could collect; and that he believed the
statement to be true.  He says that Walters told him of other
cases that had gone to court, and the insurance company had
beat them out by not settling; and that, if he went to law, he
would not get as much as he was offered; that it had to be set-
tled that day, if it was settled at all; and that he would not be
back any more.

On cross-examination, the appellant said that he did not
remember how many times he consulted with his attorney be-
tween the first and second operation; that he remembered see-
ing him twice; that his attorney told him that the question of
whether he came under the Federal or the state act was a ques-
tion that had to be proved; that he told him that perhaps he
could collect between $12,000 and $15,000.  This was before the
settlement.  He also told him that he thought he could collect
more than was being offered him; that he thought about $8,000
would be allowed for an arm; and told him to start suit, and,

if the insurance company would offer him a reasonable settlement, not to go to law with them, and that a reasonable settlement would be about $8,000.

Appellant also says that he discussed the matter of settlement with his father and stepmother; that he told Ernsberger that, if he would get a man that could give him what was right, he would settle.

The father of the appellant testified regarding the occurrences the day of the settlement:    .

"Mrs. Kilby and I went to the hospital next morning. We went to our son's room. He looked very weak and pale. He felt so bad he could hardly talk to me. He told us Walters was coming up there to try to settle. He wanted my advice to it. I says, 'I don't know how to tell you; I don't know what to say.' I says, 'I really don't know how to use my judgment on this matter.' I am not posted, and I didn't know what to say; but I says: 'I will leave it to you to do the best thing you can. You are now a man, and you ought to know more what you ought to have than I. You have done the suffering and the punishment.' Well, he says he didn't know hardly what to do. And I am sure I couldn't hardly tell him. He told me that Walters said he couldn't settle with an attorney. 'Well,' I said, 'that looks funny to me.' I says that I don't know what to think of that. 'That don't hardly look right. It looks to me like a little underhanded, like there was a snake in the fence corner, but I ain't qualified to judge.' He told me he didn't know. He told me how much Walters had offered. I says, 'That is a very small amount.' In about half an hour, Walters came. Walters said to Joe his hospital bill must be paid. If he didn't settle, he would have to fight the company from 3 to 5 years, and then at the end of 5 years, he wouldn't have as much as he was giving him, and maybe not as much. That is what he fetched in. He claimed that he had been where these other cases had been settled on the same theory, and I supposed he was giving the boy good advice. They talked, and he plead to the boy that he had some cases settled to that effect, and they came out better than if they had went into suit with the company. I said I thought he should have an attorney. Walters said he didn't want an attorney around. Walters said that was

the law, and he knew it. My son was lying flat on his back at the time conversation was taking place. Joe didn't have a great deal to say. Walters brought papers into the room. Joe signed one paper that I know of. I saw the paper, but I could neither read nor write; so I couldn't tell. Walters told me to read the papers, and I told him I couldn't read them; that I wouldn't have nothing to do with them, because I didn't understand them. There were quite a number of papers drawn up there. The nurses and Walters were signing them there. Walters read one paper. When Joe signed his name, he was lying kind of on one side, propped up with some pillows. The nurse held the paper, to steady him so he could sign. Joe said he didn't like to settle, because he didn't feel able to settle. Walters insisted on the hospital bill and the expense of it, and that he would have to have the money to pay it, and that he had better settle. Walters said it had to be settled that day, because he couldn't be back to bother with it.''

The stepmother of the appellant testified to substantially the same effect.

One Dugan, who was in the same room with the appellant, testified:

''On that Thursday evening, the first thing Walters said, after he entered the room, was that he wanted to settle with Joe. He called him Joe. Walters said he didn't want no attorney, and he didn't have time to argue with an attorney. Walters said, 'It is a good thing you settle, because it will take from 3 to 5 years to go through court, and you will not have any more money at that time than I am giving you now.' Walters said he would give him twenty-six hundred and some dollars, and pay the hospital and doctor bills. Kilby said he would have his father and mother come in. I think Walters was here about half an hour Thursday evening. Walters came back Friday morning. Joe's father and mother was here at that time. Walters told Joe's father practically what he had told Joe, the night before. On this Thursday and Friday, I don't think Joe complained much about suffering pain. Joe was in bed. On Friday, November 21st, Joe signed some papers. There was a release. I witnessed 8 papers. My bed was about 15 feet from Joe's bed. I was present all the time when these negotiations

for settlement were going on. After the operation, I saw them give Kilby injections in the arm or in the leg. On this Thursday and Friday, to the best of my knowledge Joe was weak. Walters said he wanted to get away on the train, to go to Mason City that Friday afternoon. About two weeks prior to the settlement, Jens Grothe and Walters had a talk in this room about settling. Jens Grothe advised Joe Kilby that, in his opinion, he had a valid claim of from $12,000 to $15,000 against the Charles City Western Railroad Company, for the loss of his arm. Jens Grothe told Joe that he was governed by the Federal Employers' Liability Act.''

The nurse at the hospital testified regarding the care of the appellant at the hospital, and that he was weak after the second operation; that she believed he did not suffer a great deal after the last operation, and that he sat up out of his bed about a week after this operation; also, that, on Wednesday night following the operation, he was sleeping, and had a good night.

. There is no substantial conflict in the testimony in regard to the condition of the appellant at the time that the release was signed, nor as to what was said and done at said time. It appears that, on the afternoon of Thursday, November 20th, the attorney for the appellant called at the hospital, and the nurse informed him that the doctor in charge of the appellant had given instructions that he was not to have callers; and that the attorney then left. It also appears that, about 8 o'clock the same evening, the doctor came to the hospital; that the agent of the appellee, Walters, came with him; and that the doctor informed the nurse that evening that the appellant could have callers at any time. The release was executed the following day.

We have not attempted to set out in minute detail all of the testimony in regard to the execution of this release. While the appellant was in the hospital, and had recently undergone a second operation for the injury that he had received, there is no sufficient evidence in the record that would have justified the court in submitting to the jury the question of the appellant's alleged mental incompetency to fully realize what he was doing, and to execute the release in question. The matter of a settlement had been thoroughly canvassed with the appellant, prior to this time. He had not only talked it over with the ad-

juster, but had had a full conference with his attorney, and had been fully advised by his attorney in respect to the matter, not only as to his legal rights, but as to the amount which the attorney thought he could recover by litigation, and the amount that the appellant should receive by way of settlement. He sent for the general manager of the railway company, and asked him to send a man to settle with appellant, and settle right. In addition to this, he had canvassed the matter with his father and with his stepmother, and had sent for them for the express purpose of discussing the situation with them, shortly before the release was executed.

It appears that the appellant was a man 30 years of age, with a limited education, and with the usual experience of men of his class. He understood fully that the adjuster for the appellee was seeking to obtain from him a settlement of his claim for the injury and a full release from liability. He had full opportunity to discuss the matter with his attorney, and did so. He knew that his attorney had advised him that he could recover under the Federal Employers' Liability Act, and that the attorney had stated the amount that he believed he could recover in the litigation, and the lowest amount that the appellant should accept by way of settlement. Suit had been instituted, and the petition specifically alleged that the suit was brought under the Federal Employers' Liability Act. The appellant knew that the agent was coming to see him for a further conference on the subject of securing settlement from him. He sent for his father and his stepmother to advise him in relation to the matter, and they were present when the settlement was made.

Much is argued by the appellant to the effect that the father was unable to read or write, and therefore was incompetent as an adviser to his son; but it does not appear that he did not have a full understanding of the subject-matter of the discussion, and did not know exactly what was under consideration. This was also true of the stepmother, who was present. There is no claim that the release was other than it was represented to be. The appellant could read, and there is no claim that he did not understand the contents of the instrument.

It is urged by the appellant that the adjuster fraudulently represented to the appellant that he could not recover under

the Federal Employers' Liability Act, but only under the state law. It seems, however, that this matter had been thoroughly canvassed by the appellant and his attorney. The appellant had the opinion of his attorney in respect to this matter, and also the opinion of the adjuster. A careful examination of the record convinces us that there was no such misrepresentation or fraud on the part of the adjuster in respect to this matter as could be made the basis of setting aside the release that was executed.

It is also urged that undue advantage was obtained of the appellant by the statement of the adjuster that he did not want the attorney for the appellant present at the settlement. The attorney had been present at a conference with the adjuster before, and he also had one or two conferences with the appellant when the adjuster was not present. The father and stepmother of the appellant were present, and had been sent for with the knowledge of the adjuster. We do not think that the statement of the adjuster at this time that it was not necessary to have the attorney for the appellant present, and that he objected to having him there, under all the circumstances, as disclosed by the record, could be held to be the basis of any fraud or overreaching on the part of the adjuster. While it may be true that the appellant saw fit to accept the cash tendered him, rather than take his chances on the outcome of litigation, it was a matter of choice and determination by him; and we do not find that there was sufficient evidence to go to the jury on the question of his having been unduly persuaded to make said settlement, or that there was any fraud in procuring the same. The statements of the adjuster as to how long litigation might be protracted were evidently mere expressions of opinion, and are not shown to have been fraudulently made. Such expressions cannot be made the basis of setting aside a release. *Nason v. Chicago, R. I. & P. R. Co.*, supra; *Kilmartin v. Chicago, B. & Q. R. Co.*, supra; *Douda v. Chicago, R. I. & P. R. Co.*, supra.

This is not a case where an adjuster for a company rushes to a recently injured party, and hastily secures a settlement, without giving the injured party opportunity for reflection or to obtain counsel. A reading of the record in this case satisfies us that the appellant fully understood the nature of the business

at hand. He understood fully that the adjuster was representing the appellee, and endeavoring to secure a settlement in its behalf. It was fully understood by the appellant whom Walters represented, and what his purpose was. In other words, the parties were dealing at arm's length. The appellant was an adult, of experience. He had employed an attorney, and had been fully advised by his attorney of his legal rights, and had instituted suit. He had been told by his attorney the prospects of the litigation, and the amount that the attorney thought he could recover by suit, and what he ought to accept by way of settlement. In anticipation of his conference with the adjuster, respecting a settlement, he had sent for his relatives, had canvassed the situation with them, and had solicited their advice and counsel; and they were present when the settlement was made, and took part in the discussion respecting the same. The amount of the settlement was not unsubstantial or trivial, and not such as to shock the conscience or be indicative of fraud.

A settlement of an unliquidated claim, fairly entered into between competent parties, is binding and enforcible. Such settlement becomes, in effect, a contract between the parties, and is a solemn instrument, not to be set aside lightly or impeached, except upon grounds recognized under the well-established rules of law. Fraud and overreaching have been repeatedly held by us to be sufficient to vitiate this kind of an instrument; but fraud is not to be presumed, and there must be evidence to sustain a charge of fraud before the question can be submitted to a jury. Upon the record in this case, we think it would have been error on the part of the trial court to submit to the jury the question of the mental incapacity of the appellant, or of the alleged fraud and misrepresentations in securing the release. It was a valid and binding instrument, and it is conclusive upon the rights of the appellant to maintain this action.

In view of our holding on the matter of the settlement and release, it is unnecessary that we discuss other questions argued by the appellant.

The appellee has filed an amended abstract in this case, setting out a large amount of the evidence by questions and answers. The greater part of this amended abstract is wholly unnecessary, and it is not prepared in compliance with our rules.

Fifty dollars of the cost of printing the appellee's amended abstract will be taxed to the appellee.

For the reasons stated, the judgment of the trial court is—*Affirmed.*

EVANS, C. J., STEVENS and ARTHUR, JJ., concur.