WILFRED F. COFFMAN, Appellant, v. WOODWARD H. BRENTON et al., Appellees.

IN RE ESTATE OF CHARLES R. BRENTON.

No. 41023.

NOVEMBER 17, 1931.

REHEARING DENIED MARCH 18, 1932.

Howard L. Bump, White & Clarke, and James E. Addie, for appellant.

Stipp, Perry, Bannister & Starzinger and George J. Dugan, for appellees.

FAVILLE, C. J.—The appellant in this cause brings this action against the executor and the legatees of the estate of one Charles R. Brenton, deceased. It is the contention of the appellant that he is the illegitimate son of the said Charles R. Brenton and that, by reason of an oral contract entered into between his mother and the said Charles R. Brenton, he is entitled

to participate equally with the legitimate children of the said Charles R. Brenton in the estate of said decedent. The appellees, in addition to a general denial, plead the statute of limitations, laches, and an alleged settlement claimed to have been made with appellant. The appellant by reply alleges that the settlement was obtained by fraud and that the same is of no force and effect.

The record is very voluminous, but we have examined it all with great care. The appellant's mother, a woman about seventy years of age at the time her deposition was taken, was an important witness in the case. She testified to the fact of the paternity of the appellant and to a claimed oral agreement made between her and the said Charles R. Brenton prior to the birth of the appellant in regard to the making of a will by the said Charles R. Brenton, by the terms of which the appellant was to share equally with the other children of the said Charles R. Brenton if he should marry and have children. The alleged illicit transaction is claimed to have occurred at a time when appellant's mother was a domestic in the employ of the parents of the said Charles R. Brenton at Dallas Center, Iowa. At that time she was about twenty-three or twenty-four years of age and the said Charles R. Brenton was about nineteen years of age and was living with his parents. The appellant was born in September, 1883, in Pennsylvania, where the appellant's mother had gone to be with relatives at the time of appellant's birth.

We do not deem it necessary to review the evidence bearing upon the question of the paternity of the appellant, and will for the purposes of this cause assume that there is sufficient evidence in the record to warrant a finding that Charles R. Brenton was the father of the appellant.

The appellant's claim of an oral contract entered into between his mother and the said Charles R. Brenton rests almost wholly upon the oral testimony of appellant's mother. In view of our conclusion, we deem it unnecessary to review the evidence or to make any pronouncement upon the question as to whether or not the appellant has succeeded in establishing the alleged oral agreement by that degree of clear, satisfactory, and convincing proof that is required in a case of this character. We shall for the purpose of our decision assume that there is sufficient evidence in the record from which the court might find that

there was an oral contract between appellant's mother and Charles R. Brenton substantially as claimed by the appellant to the effect that he was to share equally with the other children of the decedent in the estate of said Charles R. Brenton, but we reserve making any pronouncement or conclusion as to this fact question.

One vital and important question in the case is whether or not the settlement that was made has been successfully impeached on the ground of fraud in its procurement.

Charles R. Brenton, the putative father of the appellant, died September 1, 1924. His wife had predeceased him and he left a will by which he devised and bequeathed all his property to his two children, Woodward H. Brenton and Ruth Brenton. The will of said Charles R. Brenton was admitted to probate in Dallas County, Iowa, where the said Charles R. Brenton resided during his lifetime. Clyde E. Brenton, brother of the decedent, was appointed executor under said will.

When appellant was about nine months of age he was adopted by a family by the name of Coffman, who were relatives of appellant's mother living in Buena Vista County in this state. When a small child, appellant and his foster parents removed to the state of Nebraska, where he has since resided. He first learned that he was not the son of his adoptive parents on September 7, 1925, which was his forty-second birthday. He contends that at that time his adoptive father told him of his paternity and of his adoption by the Coffmans. Appellant contends that he then first learned from his foster father that he was entitled to share in the estate of the said Charles R. Brenton. Shortly thereafter the appellant came to Iowa and made some inquiries among relatives in the vicinity of Dallas Center in respect to his parentage and the extent of the estate left by the said Charles R. Brenton. At that time he examined the will of the said decedent and discovered that no provision had been made for him. He returned to his home in Nebraska, and shortly thereafter, by appointment, he met an attorney, Bulman, in Des Moines, in the early part of December, 1925. On that occasion he had an interview with the executor, Clyde E. Brenton, in Des Moines, and also with the legatee W. H. Brenton, at Dallas Center. With both parties he discussed his claim to a share in the estate of Charles R. Brenton. Later on the appel-

lant, with his attorney, visited appellant's mother in Ohio, and obtained from her an affidavit with regard to the claimed oral contract between her and the decedent respecting the making of a will for appellant's benefit. Thereafter the appellant and his attorney came to Des Moines and had a conference with the executor and his attorney respecting a settlement of appellant's claim, and eventually a written settlement was effectuated by which Clyde E. Brenton paid appellant $12,500 in cash and appellant executed and delivered to Brenton the following instru-. ment in writing:

"Settlement Stipulation.

"Whereas: The undersigned, Wilfred Francis Coffman, has asserted a claim against the Estate of Charles R. Brenton, Deceased, and against W. Harold Brenton and Ruth H. Brenton the only living legitimate children and devisees of Charles R. Brenton, deceased, and against the property devised and bequeathed to said W. Harold Brenton and Ruth H. Brenton, and against Clyde E. Brenton; and,

Whereas: a settlement and compromise of said claim has been made on this 23rd day of December, A. D. 1925;

This Writing Witnesses:

1. That in consideration of Twelve Thousand Five Hundred Dollars in hand, receipt of which is hereby acknowledged, the undersigned, Wilfred Francis Coffman, does hereby acknowledge full payment and satisfaction of any and all claims or rights of whatsoever kind or nature now or hereafter existing or arising against the Estate of Charles R. Brenton, Deceased, and W. Harold Brenton, and Ruth H. Brenton, and Clyde E. Brenton, personally and as executor and the property devised or bequeathed to W. Harold Brenton and Ruth H. Brenton.

2. That in further consideration of said sum received, the undersigned, Wilfred Francis Coffman does hereby promise and agree that he will not be or come within the boundaries of Dallas County, Iowa, at any time within two years from the date of this instrument and that he will not at any time during his lifetime live or reside within the boundaries of Polk or Dallas. Counties in the State of Iowa.

3. The terms and provisions of this settlement stipulation

shall be binding upon said Wilfred Francis Coffman, his heirs, devisees, legatees or assigns and shall inure to the benefit of the heirs, devisees, legatees, or assigns of all and singular the Brentons hereinbefore mentioned.

Witness my hand the day and date first above written.

Wilfred Francis Coffman.

Witness:

W. W. Bulman.''

Appellant contends that said settlement was procured by fraud and false representations, and is not binding on him. This is the real battleground of this lawsuit.

We cannot, within the reasonable length of an opinion, set out all the evidence bearing on the settlement, and shall content ourselves with a few excerpts.

Appellant testified to transactions prior to the settlement. Referring to a trip to Adel, he testified in part as follows:

''The next day I went to Levi Morgan's. I told him the story that my father, Mr. Coffman, told me. Mr. Morgan was well acquainted with the Brentons. He told me that Charles R. Brenton's estate was a very large estate. He didn't tell me that it was worth in the neighborhood of a million dollars. He told me Charles R. Brenton was a large landowner and that he had been engaged extensively in the banking business and that he was a rich man. * * * After I had talked with Levi Morgan it would be hard to know what the value of the estate was. I knew if it was all clear it would amount to a large amount. I would think the partnership would amount to a million dollars anyhow, if there were no debts or anything to take out of it. * * * I talked with Charles Gates about the estate. I talked with him in the same way. I understood it was a large estate. He didn't disclose what it was. I don't know that he knew. He gave me every assurance that it was a very valuable estate. He had lived in the county a good many years. He knew the Brentons. I knew he was a man that knew what he was talking about when he discussed these things. He was a friend of mine. Levi Morgan was a friend of mine. When these men told me that the estate was very valuable I believed them.''

Referring to a trip to the courthouse at Adel with Attorney Bulman, the appellant testified:

"He and I went to the courthouse in Adel the fore part of November, 1925. Levi Morgan was with us. We asked for the records. We talked with Mr. Graham. He gave us the records. He didn't have the original files. The records he gave us were in a big book. We went into the back of the Clerk's office and sat down and went over them. I am quite sure we did not have some of the Court's files. All he gave us was a big book. We had Mr. Bulman go over the records. I believe I glanced over this big book. There were a good many pages in it referring to this estate. I didn't count them. I can't say how many now. I know there were a great many pages containing entries by the Charles R. Brenton estate. I didn't read all of them. I don't believe Mr. Bulman read them very carefully. I think he made some notations. * * * I notice the inventory contains an itemized statement of the various assets and properties with the amounts and valuation. * * * I never figured the estate to be worth more than a half million dollars at any time. I thought that the entire estate of the Brenton Brothers was worth about a million dollars, so far as I know. I didn't think it was worth any less after I examined these records until I was told it was less. When we examined these records I found notes recorded for $200,000.00. They were given by the heirs to the decedent."

The attorney Bulman testified in regard to the trip which he made with appellant to Dallas Center, where he examined the records in the matter of the estate of Charles R. Brenton. He testified that he examined the inventory to ascertain if he could somewhere about the value of the estate. He testified in part as follows:

"I came to Adel with Mr. Coffman during that visit. We came to the Clerk's office. Looked at the records of the Charles R. Brenton Estate. It occurs to me that I made a visit to the Clerk's office once when Wilfred was with me and once when he was not with me. That seems to be something I can't get out of my mind but I cannot remember definitely. I don't know for certain whether we examined the original files when Wilfred was with me. I examined either the papers or a copy of the papers in the record. I recollect examining a list of the property that I considered an inventory. I think there was not any value set opposite the land or property listed. The face of the

notes were given. I examined this inventory to ascertain if I could somewhere about the value of this estate. I formed an opinion that it was probably considerable of an estate.''

On cross-examination he testified:

''I called for the records in the estate. They gave me what they had there. It was a list of real estate and a list of notes and some bank stock in the Des Moines National. I think that is all of the bank stock. I don't remember any of the files missing. If there was, it was made up by my examination of the record. I can't say that I had the Court files in the estate, but I had a list of the personal property and the real estate before me and made notes from it. I either had the files or had the entry about the matter in the books. It was quite an elaborate record. The inventory, or what I would call the inventory, was copied. * * * If there were no partnership debts and the bank complications, rediscounted paper, I estimated the estate was worth around $800,000.00 to $850,000.00. There were no claims of any size filed, if I remember rightly. These records showed enough so that I thought the estate was worth $850,000.00 and I really believed more than that, if the banks had been listed properly. It is impossible for me to remember that the records showed the valuation of $950,000.00 instead of $850,000.00. I didn't know anything about the value of the interest in the banks. * * * I thought, according to the records, the estate was worth about $850,000.00. I suspicioned it was more. * * * I think I talked over the value of the estate with Mr. Coffman. I told him what was listed; what I thought it was worth. I told him in a general way what was listed in the probate record. It might be going too far to say that I told him what I thought it was worth. I probably told him what the books showed. * * * Before the settlement contract I with Wilfred Coffman had examined all inventories of property filed in his estate; all lists of real estate listed in his estate; and examined the inheritance tax report on file in said estate. All my negotiations and during all the time until the settlement contract was signed I believed the estate was worth one million dollars and did not give weight to any statement that may have been made. No statements if any that were made by the adverse parties or their attorneys, result-

ed in any change of my mind about the value of the estate. I thought I knew.''

The foregoing gives some idea of the situation prior to the making of the settlement.

After making the investigation referred to in Dallas County and after obtaining the affidavit from appellant's mother, the appellant and his attorney Bulman went to Des Moines, where negotiations were entered into which culminated in the settlement referred to. The evidence regarding these transactions is voluminous and we cannot incorporate it *in extenso* in this opinion. The appellant testified that he and Bulman called on the executor, Brenton, and later Charlton, Brenton's attorney, was interviewed. Appellant testified that the parties continued negotiations for two or three days. Various propositions of settlement were made but no agreement was reached. Finally, no adjustment appearing to be possible, Bulman announced that he was going home and would bring suit. Appellant went to Brenton's bank to bid him goodbye. Regarding what then transpired the appellant testified in part as follows:

''Mr. Bulman told me there was $25,000.00 insurance and the estate would not amount to $100,000.00 and recommended to me that I accept $25,000.00 as one-third of the estate. * * * It was about two o'clock in the afternoon, and in his (Brenton's) office in the Iowa National Bank. He told me I was all wrong in my opinion of the size of that estate, that there were many debts to be paid, and said we ought to settle, and offered me $5,000.00. I didn't say anything. Mr. Brenton raised the proposition to $7,500.00. I didn't offer any suggestions or let him know I was interested. He said if I would accept it, he would send my mother $500.00 for a Christmas present. I declined that offer. He went up to $10,000.00. I still declined the offer. I told him I would have the $25,000.00 or I would not settle and I was going home at 4 o'clock when my train left. I based the $25,000.00 upon the statement Mr. Bulman had made that the estate would not be over $75,000.00 when the debts were paid. He finally said that if I got my share and got $25,000.00 it would cost me one-half of it to collect it and offered me $12,500.00. Mr. Charlton was there at that time and began to talk of the dissatisfaction and disgrace I would bring on my

own family, if I attempted to collect it. Mr. Bulman was not present. I finally agreed to accept the $12,500.00. If I accepted I told him I would like to have the money and get out on the 4 o'clock train. He says, 'You cannot close up a deal like this in a few minutes. You will not get out in time to get home on that train.' I went to the hotel to see if I could find Mr. Bulman. I could not find him and later went to Mr. Charlton's office and left word at the hotel if Mr. Bulman came in we wanted to see him, to come to Mr. Charlton's office. It was getting about five o'clock I presume. Mr. Bulman came to Charlton's office while Charlton was drawing up the contract. Mr. Bulman was not there when it was drawn, he came in afterwards. I did not sign any instrument there. Mr. Charlton was drawing it up on the typewriter; he was his own stenographer. Mr. Bulman came in when we were finishing it and Charlton told him we had settled. He asked me how much and I told him $12,500.00. He asked me if I was satisfied and I said, 'Yes,' and he said, 'I will not stand in the way.' We went back to the Brentons' bank, that is where it was signed. I signed the contract Mr. Charlton had drawn. He drew up three copies. I had one copy and read it and put it in my pocket and then we went to the Iowa National Bank where the money was received, and the contract was signed. Mr. Brenton asked Charlton how many copies he made and he told him three and he says, 'Where is the other, there is only two.' They took the third copy away from me. I received the $12,500.00. It was paid in bills wrapped up in a newspaper that he took out of his overcoat pocket hanging on a hanger in his office. This was about 5:30 or 6 o'clock. It was dark. He paid me in currency. My signature appears on the bottom of Exhibit C. That is the instrument I received when I received the $12,500.00. The money was paid to me by Clyde E. Brenton. Our negotiations with Clyde Brenton on that afternoon was the 23rd of December, 1925. Clyde Brenton never told me the value or what the estate consisted of. He did not tell me what the liabilities against the estate were. He said there were a great many, however. He never told me anything about the estate. He always withheld everything. Didn't discuss it in his talk. Things I asked him about he would tell me it was none of my business. I asked him what the estate consisted of. * * * If I had known the estate was worth nearly $1,000,000.00 I certain-

ly would not have accepted the $12,500.00. I accepted the $12,-500.00 believing that the estate was not worth to exceed $75,-000.00.''

He also testified:

''Mr. Bulman did not tell me that the estate was worth two or three million. Never did at any time. He did not tell me that the records in this Court showed the estate to be worth approximately a million dollars. He never told me that. He and I came to this Court to find out what it was worth and he never said anything about it to me. He never said a word to me after he had examined the records as to its value. Whenever I asked Clyde Brenton about the value of the estate he told me it was none of my business. I never heard Clyde Charlton say anything about the value of the estate. * * * I signed Exhibit C (settlement). I read it over in Charlton's office and I understood it. My attorney read it and he signed it as a witness, and I delivered it and intended to deliver it and got the $12,500.00. I have kept it. I have never offered to return it. It was December 22nd that Mr. Bulman and I talked about $75,000.00. It was in the afternoon. We were at the hotel lobby in the Kirkwood. I did not see Mr. Charlton that day. I had been in town all day. That was the first conversation that we had about $75,000.00. There had not been a word said about that before the afternoon of December 22nd. Up to that time, we had assumed that there was $100,000.00 apiece. We had submitted our written statement we would accept $100,000.00. At that time I assumed the estate was worth $300,000.00. I was offering to settle for one-third of it. I was not willing to make any compromise, any concession or any discount of my share. I was insisting upon the full one-third. This settlement for $12,500.00 was made on the next day.''

Bulman testified in part as follows:

''The negotiations from that point somewhat were carried on with Mr. Charlton, he going back and forth to Mr. Brenton and I going back and forth to Mr. Coffman. That continued two days, anyway, and I think two and a half or three. I recollect that early in the proceedings a written proposition was submitted to Brenton or Charlton for $100,000.00. The first propo-

sition we made Mr. Charlton was a written proposition of $100,000.00. There were several different talks. He started in by offering $500.00 and then $2,000.00 and I went back to the hotel and had a written offer to take $100,000.00 made on the typewriter and took it to him. He had talked several times that his client might give four, five or six thousand. The written proposal that I refer to is Exhibit B. Mr. Charlton said that was more than the entire estate would amount to. He told me that and I told him that I didn't look at it that way. I said to him, 'How large do you say this estate is?' and he said, '$75,-000.00 and $25,000.00 life insurance.' Then he modified it by saying, 'Nearly $75,000.00.' I told him I had seen the records here and that in my opinion it was an estate of close to a million dollars and he made the statement that when partnership affairs of Clyde Brenton and the bank's affairs were all settled, it would be about $75,000.00 and the life insurance.''

Bulman detailed the various negotiations leading up to the settlement when he went to Charlton's office. He said:

''Mr. Charlton was sitting at the desk in front of the type-writing machine and had the stipulation of settlement nearly finished. He said, 'Well, we have settled this matter, Mr. Bul-man.' I says, 'That's good.' Then I turned to Wilfred and I says, 'How much do you settle for?' He said, '$12,500.00.' I said, 'I am not going to stand in the way.' I had nothing in the least to do with dictating the terms of this stipulation. It was all written up or very nearly written up before I got back. Exhibit C is the stipulation that I refer to. I was present when it was signed. It was signed at the bank. I and Mr. Coffman and Mr. Charlton took that down to the bank where Clyde Brenton was. There were three copies. This particular one was signed in the bank. I saw the money paid over. It was in bills, I mean currency. Mr. Brenton got it out of his coat pocket, I think, a coat hanging on the wall. I think Mr. Coff-man said something about wanting a draft instead of money, but I am not certain about that. This must have been five o'clock because the bank and some of the business houses were closed. After that I went back to the hotel. That evening I went home. Mr. Coffman left too.''

He also testified:

"It seems like Charlton and I were dealing at arms' length. I was asking $100,000.00 and he was offering to begin with $500.00. I was there to try to get $100,000.00. I was representing Mr. Coffman. I wanted to get him his share, if I could. I didn't believe Clyde Charlton, although I realized that what he said about settling the partnership with Clyde Brenton in the banks might make considerable difference in the size of the estate, but what he said, I took as a basis on which I might trade for a settlement. He was pretty serious about it, said he didn't blame me for thinking it was more. I didn't advise Mr. Coffman to make a settlement because I believed that statement."

He also said:

"I talked with Clyde B. Charlton, attorney for the Brentons, I should think eight or ten times. He was in his office when he made these statements. When he told me this estate was only worth about $75,000.00, I told him I didn't think that was so; that the inventory showed nearly a million dollars. He said he didn't blame me for thinking that, but that it was not worth that."

The foregoing, while not complete, gives a picture of the situation as shown in the record.

Brenton and Charlton both deny making any representations to either appellant or Bulman regarding the value of the Charles R. Brenton estate.

The settlement having been made, the payment received by appellant, and the written instrument executed by him, the burden of proof rested on the appellant to impeach the transaction by proof of fraud. Johnson v. Chicago, R. I. & P. R. Co., 107 Iowa 1; Johnson v. Berdo, 131 Iowa 524; Kilmartin v. Chicago, B. & Q. R. Co., 137 Iowa 64; Douda v. Chicago, R. I. & P. R. Co., 141 Iowa 82; Blossi v. Chicago & N. W. R. Co., 144 Iowa 697; Kilby v. Charles City W. R. Co., 191 Iowa 926.

Under the record, only a portion of which we have quoted, we are satisfied that appellant has not successfully carried that burden. Appellant and his attorney were dealing at arms' length with Brenton and his attorney. It is not a case where an executor effects a settlement with one lawfully known to be en-

titled to participate in an estate. Appellant was asserting a claim under a contract which was disputed, and neither Brenton nor his attorney recognized that appellant had any legal right to any portion of decedent's estate. The whole proceeding was adversary and antagonistic.

Both appellant and his attorney had ample opportunity to become fully advised in regard to the value of the Charles R. Brenton estate. They had ready access to official records and made investigation in regard thereto. Appellant introduced the negotiations which led to the settlement. There was much sparring back and forth before an agreement was reached, but we fail to find that appellant has sustained the burden of establishing fraud in the making of the settlement and execution of the release. It is a matter not to be overlooked that appellant at all times had the counsel and active participation of his attorney in all that was done. He was not entrapped or persuaded into a settlement. All the negotiations passed under the inspection of his attorney. Nothing was done behind the attorney's back or in a corner. As bearing somewhat on such a situation, see Kelly v. Chicago, R. I. & P. Railway Co., 138 Iowa 273; Burke v. Berry, 152 Iowa 110; Owens v. Norwood White Coal Co., 157 Iowa 389; Cochburn v. Hawkeye Association, 163 Iowa 28; Kilby v. Charles City W. R. Co., supra; Farnsworth v. Hazelett, 197 Iowa 1367.

We deem it unnecessary to prolong the discussion. We fail to find in the record sufficient evidence of any fraud or misrepresentation in the negotiations terminating in the execution of the settlement to impeach its validity. The appellant has not successfully carried the burden resting upon him. It therefore must follow that the settlement is valid and binding.

This conclusion renders it unnecessary that we consider other matters presented in argument.

The trial court was right in dismissing appellant's petition and the decree entered below is—Affirmed.

Stevens, De Graff, Albert, and Wagner, JJ., concur.