W. J. BURKE, J. S. DEWELL, E. E. GIRTON and C. E. CAMPBELL, Appellants, v. S. T. BERRY, J. D. BERRY, C. S. BERRY, and the VALLEY NATIONAL BANK, Appellees.

**False representations in the purchase of corporate stock:** EVIDENCE. In this action for damages for alleged false representations inducing the purchase of corporate stock, and to have the

damages recovered applied on the balance of the purchase price, the evidence is reviewed and held insufficient to support a finding that the representations were knowingly and intentionally false, but rather that plaintiffs purchased after full and independent examination of the condition of the corporation and its business.

*Appeal from Polk District Court.*—HON. W. H. McHENRY, Judge.

SATURDAY, JUNE 10, 1911.

THE defendants Berry sold to the plaintiffs a majority of the shares of capital stock in an insurance corporation known as the Capital Insurance Company, and doing business at Des Moines, Iowa. The agreed price of this stock was $51,050. Of this sum plaintiffs paid $25,000 at the time of making the contract, and evidenced the remainder of the debt by their two promissory notes, one for $13,050, due January 1, 1908, and one for $13,000, due January 1, 1909. The first-described note was paid before due. Thereafter plaintiffs instituted this action in equity, alleging that in making said sale defendants acted principally through the said S. T. Berry, and, as an inducement to plaintiffs to make the purchase, he represented and stated to them that the annual financial statement which said company had made to the State Auditor for the year 1905 was true and correct in all particulars. They further allege that they believed and relied upon said statements and representations, and were thereby induced to make the purchase, which they would not have done had they understood or known the true condition of said company and its business. They aver, however, that said financial statement was incorrect, false, and misleading in several material particulars, which will be more fully referred to in the opinion, and that by reason thereof they have suffered great damage. Plaintiffs ask, therefore, that the last remaining note given by them as aforesaid may be brought into court, that an

accounting be taken of their said damages by reason of the matters and things charged in the petition, and that the amount so found be applied as a credit on said note. Defendants admit the sale of the shares of stock to the plaintiff, but deny having in any manner falsely represented or warranted the financial condition of the company or its business. They further allege that plaintiffs made the purchase only after a full and independent investigation by one of their own number on whose examination and report they relied in completing the deal. By way of cross-petition defendants ask judgment against plaintiffs on their said promissory note, and that a lien therefor be established on their said shares of stock which are held by the defendant bank as security for the payment of said indebtedness. On hearing the evidence the trial court dismissed the plaintiffs' petition, and found for the defendants upon their cross-petition for the relief prayed. Plaintiffs appeal.— *Affirmed.*

*Clark & Hutchinson,* for appellants.

*Carr, Carr & Evans* and *O. M. Brockett,* for appellees.

WEAVER, J.—The record presented is very voluminous, and any attempt to treat it in detail within the permissible limits of an opinion would prove confusing rather than helpful. We may, however, outline certain leading facts from which the essential nature of the controversy and the situation of the parties with respect thereto can be developed with reasonable clearness. The Capital Insurance Company was organized and began business in Des Moines at some time prior to the year 1888. During that year the plaintiff C. E. Campbell, then a practicing lawyer in that city, became connected with the company as its assistant secretary, and continued in that relation for a period of about ten years. During that time the chief sec-

retary took little or no part in the duties of the office, the active functions of which were left to Campbell. In 1898 Campbell relinquished the office to accept a position in the city government, and at the end of two years became secretary of another local insurance company known as the "Bankers' & Merchants'" in which connection he remained until the transaction out of which this litigation has arisen. During all this time he remained a stockholder in the Capital Insurance Company and a member of its board of directors. At and prior to the date of the purchase of stock now in question, the plaintiffs Girton, Burke, and Dewell were all associated with Campbell in the ownership and management of the Merchants' & Bankers' Company; Burke being a stockholder and Dewell a stockholder and director, and said purchase was made by them with a view to uniting the business of the two companies. The defendant S. T. Berry, with other members of his family, became owners of a majority of the stock of the Capital Insurance Company about the year 1892, which control they maintained until the transfer of their stock to the plaintiffs. After retiring from the position of secretary of the Capital Company, Campbell, as we have noted, remained upon its board of directors, the meetings of which he attended quite regularly. Early in the year 1906 in a conversation with Campbell, S. T. Berry expressed his purpose or desire to sell the company if a fair price could be obtained. Campbell suggested that he might be able to procure a buyer and sought for a time to interest some third person in its purchase. Later, on consultation with his coplaintiffs, the purchase of Berry's stock was discussed with a view to consolidation of the two companies, and Campbell as their representative entered into negotiations with Berry for that purpose. On June 21, 1906, these negotiations had reached a point at which a form of proposed contract was drawn and left in the hands of Campbell, who executed a written acknowledgment or receipt as follows:

C. E. Campbell hereby acknowledges to have received from S. T. Berry the draft of a certain contract dated June 21, 1906, between said S. T. Berry and C. E. Campbell, for the sale of the control of the stock of the Capital Insurance Company, it being understood that said C. E. Campbell is to retain the said contract in his possession, and that the same shall be signed by both parties thereto, and become effective after the examination of the books of the company, as provided in said contract, and the acceptance of its provisions by the parties of the second part, and payment to the said S. T. Berry, of $25,000.00 in cash and delivery to him of promissory notes stipulated for in said agreement. Executed in duplicate at Des Moines, Iowa, this 21st day of June, 1906. [Signed]    C. E. Campbell. S. T. Berry.

Soon thereafter Campbell entered upon an examination (the extent of which is a matter of dispute) into the books and financial condition of the company. On August 23, 1906, the contract of sale was executed by both parties on terms already sufficiently stated. At the same time Campbell made and executed a written report or certificate concerning his examination into the condition of the company, as follows:

Des Moines, Iowa, August 23d, 1906. This is to certify that I was duly authorized and appointed by J. S. Dewell, W. J. Burke, E. E. Girton, C. E. Campbell and others, to examine into the conditions of the Capital Insurance Company of Des Moines, Iowa, and duly authorized by the above parties, after careful examination as above, and if satisfactory to me, to close the contract with S. T. Berry for the purchase of five hundred and ten and one-half shares of the capital stock of said company for the sum of $51,050.00, payable as follows: $25,000.00 cash and two joint promissory notes for $13,025.00 each with six percent interest from date of January 1st, 1907, payable $13,025.00 January 1st, 1908, and $13,025.00 January 1st, 1909. I further certify that I have made a careful, full and independent examination of the condition of said company's affairs, and as the result of said examination, as made by me for the above named J. S. Dewell,

W. J. Burke, E. E. Girton, C. E. Campbell and others, and having found the condition of the company satisfactory have closed the contract with S. T. Berry for the purchase of the five hundred and ten and one-half shares of the Capital Insurance Company stock mentioned above.  All the above mentioned Capital Insurance Company stock ($51,-050.00) and $1,000.00 of the capital stock of the Capital Insurance Company of Des Moines, Iowa, issued to C. E. Campbell, to be held by S. T. Berry in escrow, as per contract, as collateral security for the payment of the two joint promissory notes described above, given S. T. Berry for the unpaid amount due him for the purchase price of said five hundred and ten and one-half shares of stock of the Capital Insurance Company, as per contract.  Executed in duplicate.  C. E. Campbell.

The contract of purchase, which was signed by all the plaintiffs, also concludes with the following clause:

This contract is made and signed after the parties of the second part have satisfied themselves as to the condition of the company by a full and independent investigation by C. E. Campbell of Des Moines, Iowa, duly authorized by us to make and complete said examination.

It is the claim of the plaintiff that at the close of the year 1905 (the year last preceding their purchase of the stock) the defendants, as officers and managers of the Capital Insurance Company, made a statement or report to the Auditor of State, setting forth in various schedules and with considerable detail its assets and liabilities, and they allege that defendants to induce the sale of their stock pointed out said report as a correct representation of the company's condition, and assured plaintiffs that each and all of the items therein contained could be relied upon as true.  They aver, however, that said representations were false and untrue, and were known by the defendant to be false and untrue, in the following respects:  (1) That among the policies so reported outstanding and issued for terms of five years each was a considerable number

issued for six years. (2) That an item of $721.87 reported as cash on hand did not in fact represent any cash, but a mere temporary credit in the company's bank which was obtained by drafts drawn on its agents at the close of the year, most of which drafts being dishonored, were later charged back to the company, thus canceling its credit. (3) That said report failed to disclose indebtedness of the company to its agents to the amount of $5,000. (4) That said report failed to disclose certain agreements and contracts with the company's agents for extra commissions or increased compensation. Plaintiffs further claim that, to induce said purchase, defendants represented and stated to them that the business done by said company and the risks which it was then carrying were of a superior and desirable class, and that its policies were written at adequate rates, when in truth and in fact, as plaintiffs later discovered, the risks so carried were to a large extent written upon property of a hazardous and undesirable character, and at insufficient and inadequate rates of premium. Concerning the first of these items, it is conceded by defendants that, by mistake, the company's report did not disclose the existence of a limited number of six-year policies—a kind of risk it had ceased to carry except as to a comparatively few policies not then expired—and that the effect of it was to enable the company to withdraw from its reserve fund about $4,000 which should in fact have been left therein until after plaintiffs had taken over the stock. But the real dispute at this point is whether that mistake was made known to Campbell at the time of his examination of the company's affairs, and before the purchase was completed.

Plaintiffs are charging fraud and deceit, and the burden is upon them to establish it. Campbell insists that knowledge of this fact did not come to him until some months after the purchase of the stock, but the assistant secretary of the company swears that he called his atten-

tion to this specific fact at the time of the examination preliminary to the purchase. This statement is corroborated by S. T. Berry and John D. Berry, who claim to have been present and heard the conversation. Giving to these four witnesses equal credit for candor and veracity (and we see no reason why we should not), we think it must be said the alleged misrepresentation concerning the item now in question has not been sufficiently established.

Concerning the item of cash on hand, the fact that something more than $700 of this sum represented bank credit obtained by drafts drawn for balances due from agents is admitted, but we are unable to discover from the evidence how or to what extent, if any, this fact has worked any injury to the plaintiffs. Indeed, it appears that all these balances were subsequently collected except a matter of about $130, a loss (if it be a loss) to the company which of itself could not have affected the market value of its shares of stock.

The further claim that the report to the Auditor did not disclose an item of $5,000 indebtedness to agents arises from the fact that instead of stating in separate items the aggregate sum due from agents and the aggregate indebtedness to agents, the company's officers in making the report deducted the latter from the former and reported the balance so found. There may be some doubt whether this report is as specific as it should have been made, but the statutory regulation in this respect is not clear, and the instructions given to insurers by the state insurance department concerning reports of this character may fairly be construed as permitting it. There is nothing to indicate any purpose on part of the officers to deceive the Auditor or any other person concerning the true condition of this account. But again we have to say there seems to be no showing that plaintiffs have suffered injury or damage by the irregularity, if such it be.

The same may be said concerning the alleged discovery

that certain agents had been accorded or promised special favors or increased commissions. Nothing concerning rates of agents' commissions is contained in the report to the Auditor of State, nor is there any allegation or proof of any false statement or representation as to the rates of commission being paid.

Perhaps the most important item of the claim in suit is the one based on what counsel denominate "bad underwriting"—the alleged hazardous and undesirable character of the risks insured, and the resulting excess of losses suffered, conditions, which, if proved, might well affect unfavorably the value of the shares of stock. The representations relied upon were to the general effect that the company was doing a good or excellent business; that its business was of as good quality as that of any other insurance company in the state; that it was a clean first-class insurance business, and other expressions to the same general effect. Defendants admit that these or statements of substantially similar import were made by them, and insist they were made in truth and good faith and in the sincere belief, which they still entertain, that such was the real character and quality of the business. It will be observed that these expressions are all of a general and indefinite kind. No false or fraudulent representation is alleged or shown as to any particular risk or policy, or even as to any specific class or kind of policies or risks. Generally speaking, mere words of puffing or praise by the seller concerning the subject of sale are treated as expressions of opinion, and, no matter how extravagant, the buyer relies thereon at his peril. But we do not wish to be understood as holding that in the sale of corporate stock there may not be representations of the general quality and character of the corporate business, the falsity of which would constitute actionable fraud. Where, however, the facts are such that the statements made are fairly consistent with truth and good faith, they should be so treated

and construed by the court. A statement that the business of an insurance company issuing thousands of policies is sound, clean, and high class is not proven false by going through its risks and selecting one here and there which is unduly hazardous or for which an inadequate premium has been exacted. In common fairness such expressions should be held to apply to the business as a whole and not to each and every item thereof. Probably no insurance company doing business through a multitude of agents scattered over the state, no matter how carefully or conservatively administered and managed, can escape all poor risks or avoid seasons where losses seem to multiply beyond its reasonable anticipations. The record here does not disclose any essential unsoundness in the business of the Capital Insurance Company as a whole. Its ratio of losses, both before and after it came into the control of the plaintiffs, appears to have been not less favorable than the average of the companies with which it was competing. We are quite convinced from the showing made that the commendatory terms indulged in by defendants concerning the general character of the company's business could not, and did not, mislead the plaintiffs, to their injury.

Plaintiffs were no inexperienced tyros. Two of them were educated lawyers, and all experienced insurance men. Campbell had been intimately associated in the actual conduct of the company's business for ten years, and from that time he continued as an active member of its board of directors and (most of the time at least) one of its executive commitee. The knowledge thus derived he supplemented by a personal examination which he then described as "full and independent"—an examination expressly made in view of the purchase of the stock, and, while he may not have been familiar with all its details, it is difficult to believe that he was not well informed as to the general character and quality of the business. Under the circumstances, his knowledge was the knowledge of all the plaintiffs. We

do not undertake to say how far, if at all, the plaintiffs' execution of a contract acknowledging a satisfactory independent examination of the company's office, or Campbell's written report of a full and independent examination into the same, or the admitted fact that he did make an independent examination to some extent, at least, operates as a defense or estoppel to the claim now in suit. To say the very least, it is entitled to great weight as a circumstance bearing upon the question whether they were deceived or misled by the false assurances or false representations on the part of the defendants. It may also be conceded for the purposes of this case that even with such examination independently pursued, if defendants by any trick, deception, or subterfuge thwarted the examiner's search or inquiry, they could not legally avail themselves of any advantage thus dishonestly obtained. But the record is barren of any such evidence. The offices and books were opened to Campbell's examination. He himself says that no obstacles whatever were thrown in his way and the company's office force were instructed to render him any assistance asked for. As a man of nearly twenty years active experience in the management of such companies, it would seem that he, if any one, would know where to find the sore spots, if any, in the business which he was investigating. Whether that investigation was "full" or partial only, it is true that he continued it until ready to quit of his own accord, satisfied that he knew enough of the company's condition to render the purchase of its stock a desirable investment. If deceived, we think it must be said he was self-deceived. Defendants can only be held liable on the theory that they were guilty of fraud or deception. To sustain such a charge, there should be produced something more than grounds of suspicion. The facts must fairly and naturally point to that conclusion, and those facts must be inconsistent with any reasonable theory of good faith in the party accused of the wrong.

As we have already said, there is no such showing in the record, and in our judgment the decision of the trial court must be sustained.

Appellees raised some points of pleading and practice on which they object to the maintenance of plaintiff's action, but, in view of our finding that the case may properly be affirmed on the merits of the controversy, we shall not stop to consider them.

The judgment of the district court is *affirmed*.