FRANK KILTS, Appellant, v. JAMES READ et al., Appellees.

No. 41835.

Sidney Benson and B. H. Bowler, and Robertson & Wolfe, for appellant.

Paul E. Roadifer and Addison G. Kistle, for appellees.

ANDERSON, J.—The determination of this case involves, principally, a question of fact. James W. Read, the grandfather of the defendants-appellees, died in November, 1892, leaving a will which was admitted to probate in Harrison county, Iowa. He left surviving, his widow, now deceased, a daughter, May Hill, and a son, Rollin H. Read. James Read, Jr., and Mattie Frazier, the appellees herein, are the children of Rollin H. Read, now deceased. May Hill, the daughter, had no children. The appellees herein were her only blood relation. The plaintiff-appellant is a young man about 30 years of age and unmarried, and is a nephew, by marriage, of May Hill, now deceased. The controversy here presented is over the will and estate of May Hill. The will of May Hill, which was filed for probate in Harrison county, Iowa, bequeathed to Ettie Kilts, the mother of plaintiff, for her use during her lifetime, and to be equally divided among her heirs at her death, certain property in the town of Logan, Iowa. It also gave her all the household goods of the testatrix. The will bequeathed to the plaintiff, Frank Kilts, certain property in Logan, Iowa, during his natural life, and provided that, in case he died without issue, the property should become the property of the children of one Eva Middelton. The will also gave to Frank Kilts 60 acres of land in the state of Florida. Another bequest was made to one Mable Hill, with the same provisions as contained in the bequest to Frank Kilts, and in addition gave to the said Mable Hill, absolutely, certain government bonds. There was a further provision in the will which gave to W. N. Graves and wife and C. N. Wood and wife

all of the money and personal property of the testatrix not otherwise disposed of by said will; and the will appointed W. N. Graves as executor of the estate without bond.

Objections were filed to the probate of the will of May Hill, and a special administrator was appointed for her estate. One A. R. Frazier, who was administrator *de bonis non* of the estate of James W. Read, commenced an action, under order of the court, asserting claim to the property held by May Hill at the time of her death, claiming that May Hill had only a life estate in the personal property held by her under the will of the said James W. Read deceased; and that the personal estate of the said James W. Read became the property of James Read, Jr., and Mattie Frazier, upon the death of the said May Hill. James Read, Jr., and Mattie Frazier, the appellees herein, joined in said action as plaintiffs. The petition prayed that an accounting of the personal estate of the said James W. Read be had, and that the amount determined by decree be held to be the property of James Read, Jr., and Mattie Frazier, under and by virtue of the terms of the will of the said James W. Read. The amount thus claimed by the appellees was approximately the sum of $49,000, and appellees were also asserting an additional claim in excess of $3,600 for taxes paid upon jointly owned property.

Such was practically the situation of the parties and the status of the record when, on January 6, 1931, the plaintiff, who was teaching school at Rinard, Iowa, wrote a letter to Florence Read, the wife of James Read, Jr., in which he said:

"If aunt Mae wanted me to have part of what she could legally give me I would like to have it. * * * I would appreciate it if you would write, or have James write and give me all of the inside dope on the question, and advise me what I should do. Could I hear from you real soon?"

On January 19, 1931, the plaintiff wrote another letter to James Read in which he states that he had a letter from his father about the legal side of his Aunt Mae's will, and in this letter he stated:

"When the case is brought to trial, just what do you want me to do? As I wrote before, our families have been friends, and I know that you and Mrs. Frazier would give me a square deal. I am willing to do anything within the bounds of reason to help you.

I can see your side of the question. Will you tell your mother she is welcome to anything in the house. I would like to have for myself, the three piece parlor suit. Please write me as soon as you can, and give me all the dope you can. As I said before, I am willing to meet you halfway and then some. Tell me what you want me to do."

Plaintiff wrote a second letter to Read on the same day, in which he stated:

"Just had a telephone call from Graves in regard to the Hill will, he wanted me to sue with him. This is what I want you to understand, I did not and will not authorize him or any lawyer to file or start any kind of legal action against you or your family. * * * If the will is thrown out, and you folks want me to have something, O. K., but I will not go to law to enforce my demands. If there is anything that I can do to help you or Mrs. Frazier, let me know. I repeat: I have not authorized Mr. Graves or Chas. Wood to do anything in my behalf as far as law is concerned."

On January 21, 1931, James Read, Jr., answered the letters of the plaintiff in which he expressed the thought that he did not want the estate used up in litigation, and that he desired a friendly adjustment, if possible, and stated that if a compromise appealed to plaintiff, for him to write again. On January 24, 1931, the plaintiff wrote again to Mr. Read, stating:

"You spoke about a compromise or something to that effect. Before giving an answer either way, I would like to have you explain just what it would mean. I am willing to meet you on even grounds. My supposition that all of the real heirs (that is the relatives and not some outsiders) should share alike. As you say, there would be enough for all, if we could agree. Let me know as soon as you can what proposals you and Mrs. Frazier would be willing to make."

· Plaintiff again wrote Mr. Read on January 31, 1931, in which he stated that he had not received an answer to his prior letters and repeated:

"Will you please let me know just what you want me to do and what you will agree to do."

On February 9, 1931, the plaintiff again wrote to James Read, reciting that he had had no reply to his last letter and further stated:

"You spoke of being willing to make some kind of a settlement or compromise in regard to the will of Mrs. Hill. As I have said, I respect your opinions and claims and am willing to do anything that will bring about a quick settlement of the case."

On February 21, 1931, plaintiff again wrote to Mr. Read, again saying that he had no reply to former letters and stated further:

"Will you please let me know by return mail just what you would like to have me do as it will not be long until the case comes up, and if possible, I want to settle the thing out of court and save us both a lot of unneeded expense."

On February 22, 1931, plaintiff wrote a letter to P. E. Roadifer, in which he said that he was writing in regard to the contested will of Mae Hill, and that he was informed that Roadifer was to handle the legal side of the case for James Read and Mrs. Frazier, and he further stated:

"I am, as no doubt you know, named in the will, also to receive my mothers share of the same. I realize that, unless there is something settled soon, a greater share of the estate will be used up in litigation. No reply has been received my letter (to James Read), so I wrote him again Saturday, I am ready to meet him and his sister halfway in anything legal and within the bounds of reason so that we can get things settled up. * * * Will you please confer with Read and Mrs. Frazier as soon as possible and let me know."

Following the foregoing correspondence, and on the 28th day of February, 1931, James Read and his attorney, P. E. Roadifer, went to Rinard, and after a conference with the plaintiff, the contract, Exhibit 2, was entered into. It was later discovered that a part of one paragraph of the will of May Hill had been omitted from the contract, and on the 2nd day of March, 1931, Mr. Read again went to Rinard, and the contract, Exhibit 1, was entered into. The contracts are apparently the same with the exception of the added clause; and these are the contracts involved in this action, and which the plaintiff seeks to set aside on the grounds of fraud and misrepresentation. The contracts are long, and it would serve no

purpose to set them out in this opinion. They were executed by Mattie Frazier and James Read, as claimants and objectors, and by Frank Kilts, legatee under the will of May Hill; and recite the death of May Hill on December 4, 1930, and quote paragraph 2 of her will in which she bequeathed a life estate in certain property in Logan, Iowa, to Ettie Kilts, the mother of the plaintiff, and the remainder over to her heirs. Ettie Kilts died prior to the death of May Hill, leaving as her only heir the plaintiff. The contracts also quote paragraph 4 of said will, which bequeathed to plaintiff certain property in Logan, Iowa, during his natural life, remainder to his children, and, if he leaves no children, the remainder to go absolutely to the children of one Eva Middelton. The paragraph also bequeathed to the plaintiff 60 acres of land in the state of Florida. The contract further recited that James Read and Mattie Frazier, the appellees, were the sole heirs of May Hill, and that they had filed objections to the probate of her will; that they also had a claim against the estate of May Hill on account of the payment of taxes advanced by them upon land in which she had an interest; that the said appellees were also asserting claim to certain property of the estate based upon the provisions of the will of the grandfather, James W. Read. The contract further provided, and it was mutually agreed, that in composition and in full settlement of the several rights of the parties to the said contract in and to the property referred to, and the claimed rights of the appellees against the estate of May Hill, the said Frank Kilts should receive an undivided one-half interest in the property described in paragraphs 2 and 4 of the will; and that James Read and Mattie Frazier should each receive an undivided one-fourth interest therein; and that such division of the property should be made between the said parties, regardless of the result of any litigation involving the same.

Following the execution of the contracts above referred to, and on May 21, 1931, the plaintiff wrote to James Read requesting that Read make him a cash offer for his interest in the estate property.

Plaintiff now claims that he is entitled, under the terms of the will of May Hill, to the property bequeathed to him, and also to the property bequeathed to his mother; and claims that the contracts above mentioned should be set aside and held for naught for the reason that they were obtained from him through fraud and misrepresentation on the part of James Read, Jr. and P. E. Roadifer.

The plaintiff's case, as to the alleged fraud and misrepresentation, rests wholly upon his own unsupported testimony. He claims that Read and Roadifer represented to him that the will of May Hill could not be probated; that it was not legally executed, and the testatrix was incompetent to make a will; that, even though the will was admitted to probate, the claims of James Read and Mattie Frazier were sufficient in amount to entirely consume the estate, and nothing would be left for the plaintiff; that the aggregate amount of the estate left by May Hill was $60,000; that May Hill only received a conditional fee estate in one-third of the personal property left by her father, James W. Read; and that as a matter of fact the said defendants, appellees herein, were entitled to all of the property of the said May Hill, deceased, through the will of James W. Read; and plaintiff claims that he was unacquainted with the facts and circumstances about which said statements and representations were made; that he was unacquainted with May Hill during her lifetime, and did not know the nature or extent of her property and the estate, or the value thereof; that he was and is ignorant of the laws of the state of Iowa, with reference to wills; and that he relied wholly upon the statements and representations of James Read and P. E. Roadifer in entering into the said contract. And plaintiff claims that all of such statements and representations so made as alleged were false and untrue and so known to be by Read and Roadifer at the time they were made. The testimony of plaintiff in reference to the alleged false and fraudulent representations was denied both by Mr. Roadifer and Mr. Read. Mr. Roadifer testified that, after the receipt of the numerous letters from the plaintiff suggesting a settlement of the pending litigation, he suggested to Mr. Read that they go to Rinard and interview the plaintiff, and attempt a settlement of the matters in which they were interested; that he told Mr. Kilts, the plaintiff, that, if he and Mrs. Frazier and Mr. Read could agree on the terms of the settlement it would end all further litigation as far as the parties were concerned; that he had prepared a contract of settlement, leaving the percentage of division of the estate blank, and that he handed one copy of such contract to the plaintiff and read the other copy to him, a paragraph at a time, discussing each paragraph with Mr. Kilts as it was read; that Mr. Kilts stated at the time that he was very anxious to avoid litigation, and that he had begun to get uneasy because Mr. Read had not answered

his letters. The interests of other devisees under the will was talked over, and it was discussed that, if settlements with them could be effected, it would be better for Kilts to have a fee estate rather than a life estate, as created by the will; that Mr. Kilts asked, if he signed the contract, if that would constitute settlement whereby he knew that he would get one-half of the property; and that, when he was advised that such would be the result, he expressed himself as satisfied; that he was then told that, if there was any question in his mind about the contract, to consult with some of his friends, or take it to an attorney, because, after it was signed, all parties wanted it to be an end to litigation. Mr. Roadifer also testified that he told the plaintiff that, under the laws of Iowa,

"We did not have any great confidence in being able to get sufficient evidence to get the case to the jury on the will contest."

He also testified that he stated to the plaintiff with reference to the James W. Read will:

"I did not know what the court would do with reference to accumulations; and that I was very confident that the court will construe the Read will as creating a conditional fee estate, and that I considered that James Read and Mattie Frazier had a good case."

James Read, who was present, and took part in the conversation above referred to, corroborated Mr. Roadifer in his testimony. It is conceded in the argument of appellant that the testimony of Kilts, the plaintiff, was denied by the witnesses Roadifer and Read. Appellant makes this statement:

"It is true that James Read and P. E. Roadifer deny in their testimony that this representation was made to the plaintiff in a positive way, that they were not positive in their claim that the will of May Hill could be probated, and that they were more hopeful of getting all of the property through the will of her (May Hill) father, who was their grandfather, James W. Read, deceased."

Manifestly the plaintiff's proof as to the alleged fraud and misrepresentation fails to be clear, satisfactory, and convincing. It follows that it is unnecessary to inquire into the truth or falsity of the alleged false and fraudulent statements and representations, unless and until the plaintiff produces the quantum of proof necessary to establish that such representations were in fact made, and

that he relied upon the same in executing the contracts in question. This, we hold, he has failed to do. There was no fiduciary or confidential relations existing between the plaintiff and the defendants. The plaintiff knew he was dealing with a lawyer representing the interests of the defendants. He knew of the pending litigation and the claims being made by the defendants. He was a matured man, 30 years of age, with an education and experience acquired in colleges and as a teacher in high schools. He was not pursued or importuned to make the settlement that he did. He had written nine letters over a period of two months, suggesting that some settlement or adjustment might be made as between himself and the defendants relative to their interests in the estate of May Hill.

By the recitations in the contract, Kilts was advised as to the terms of the May Hill will; just what property had been left to him under its terms; that James Read and Mattie Frazier were the sole heirs of May Hill; that they had a claim growing out of the payment of the taxes against the May Hill estate, amounting to something over $3,600; and that they were basing a claim to the property of May Hill by reason of the provisions of the will of James W. Read, their grandfather, and who also was the father of May Hill. The nature of this claim was fully set out in the contract. He was also told at the time of the execution of the contract that it might be advisable for him to consult with some friend or an attorney in reference to the matter. It would seem that he was acting upon his own initiative and his own judgment in entering into the contract.

The objections to the probate of the will of May Hill were withdrawn some time after the contracts were executed, and the will was admitted to probate. As to the other claim of the appellees which they asserted under the will of their grandfather, James W. Read, the validity and extent is still evidently undetermined, but of course cannot be determined in this action. We are not required to determine at this time whether such claim had merit or not. It was urged in good faith, and it apparently was a question whether or not it could be established. Adams v. Adams, 70 Iowa 253, 30 N. W. 795; Bockes v. Union Mutual Cas Co., 212 Iowa 499, 232 N. W. 156.

The testimony of the plaintiff as to the fraud and misrepresentations alleged is controverted in the record by equally credible testimony.

█ We quote from the case of Johnson v. Tyler, 175 Iowa 723, 157 N. W. 184, 187:

"It is also well settled that the court will not grant relief on the ground of fraud unless the fraud alleged and relied upon, and which if proven would justify the court in doing so, is established by clear, convincing, and satisfactory evidence." See, also, Epps v. Dickerson, 35 Iowa 301; Ley v. Metropolitan Life Ins Co., 120 Iowa 203, 94 N. W. 568.

A mere preponderance of the evidence is not sufficient. Edmunds v. Ninemires, 200 Iowa 805, 204 N. W. 219; Clark v. Beck, 208 Iowa 156, 225 N. W. 353.

Fraud is not presumed. And in this class of cases, especially where title to real estate is involved, it must be established by clear, convincing, and satisfactory evidence. Schrimper v. C., M. & St. P. R. R. Co., 115 Iowa 35, 82 N. W. 916, 87 N. W. 731; Harvey v. Phillips, 193 Iowa 231, 186 N. W. 910; Edmunds v. Ninemires, supra; Epps v. Dickerson, supra; Johnson v. Tyler, supra.

We are not satisfied that there is any proof in the record that the settlement effected by the contract was not a fair and meritorious one under all the facts and circumstances shown. At least the plaintiff seems to have been satisfied with it for several months, and until he was solicited, or at least conferred with, and advised by attorneys from Minneapolis. And following such conferences the present litigation was commenced.

█ Some claim is made by appellants that there was no consideration for the contracts here involved. We think there is no merit in such claim. Courts favor and uphold the friendly settlement of differences of property rights, and we think there was a sufficient consideration shown in this instance. Adams v. Adams, supra; Watrous v. Watrous, 180 Iowa 884, 163 N. W. 439; In re Estate of Acken, 144 Iowa 519, 123 N. W. 187, Ann. Cas. 1912A 1166; Smith v. Smith, 206 Iowa 606, 219 N. W. 512; Coffman v. Brenton, 214 Iowa 185, 239 N. W. 9.

Defendants were asserting claims against the estate of May Hill and, indirectly, to the major property of her estate. There seems to have been a fair question as to the legality of these claims. The burden is on the plaintiff in this case to establish, not only that the representations claimed to have been made to him were in fact fraudulent and untrue, and so known to be by Read and Roadifer,

but that he believed such representations, and was thereby induced to enter into the contract here involved. Under the record, as we interpret it, the appellant has not successfully carried the burden imposed upon him. Appellant invited and induced the negotiations which led up to the settlement. He was not entrapped into the settlement. Kelly v. C., R. I. & P. R. Co., 138 Iowa 273, 114 N. W. 536, 128 Am. St. Rep. 195; Burke v. Berry, 152 Iowa 110, 131 N. W. 753; Owens v. Norwood Coal Co., 157 Iowa 389, 138 N. W. 483; Cochburn v. Hawkeye Assn, 163 Iowa 28, 143 N. W. 1006; Kilby v. Charles City Co., 191 Iowa 926, 183 N. W. 371; Farnsworth v. Hazelett, 197 Iowa 1367, 199 N. W. 410, 38 A. L. R. 814; Coffman v. Brenton, supra.

We deem it unnecessary to prolong the discussion. We have carefully gone over the entire record in this case. Considering the circumstances and conditions existing and surrounding the execution of the contract, it seems clear that the trial court was justified in its finding that the appellant did not meet the burden of proof to entitle him to relief. It follows from what we have said that the determination of the case by the court below was right, and it should be, and is, affirmed.—Affirmed.

KINDIG, C. J., and STEVENS, MITCHELL, and KINTZINGER, JJ., concur.