DALLAS REAL ESTATE COMPANY et al., Appellants, v. C. H. GROVES et al., Appellees.

No. 45062.

MAY 14, 1940.

REHEARING DENIED DECEMBER 13, 1940.

Edson & Edson and Lew McDonald, for appellants.

Miller, Miller & Miller, for C. H. Groves, appellee.

Donald Holdoegel, for P. C. Holdoegel, appellee.

MITCHELL, J.—The Dallas Real Estate Company, a corporation, and W. H. Brenton as plaintiffs commenced this action

against C. H. Groves and P. C. Holdoegel on three certain promissory notes, signed by C. H. Groves and endorsed by P. C. Holdoegel. The petition asks judgment in the amount of $39,388.78 plus interest and costs. C. H. Groves filed a separate answer in which he pleads as a defense, that the notes sued upon had been fully compromised and settled and receipt showing full payment issued by the plaintiffs to the said C. H. Groves. The plaintiffs by way of reply allege that the settlement was procured by fraud. C. H. Groves filed a motion for a separate trial which was sustained. Plaintiffs then filed a motion to transfer the issue of fraud to the equity side of the calendar, which motion the court sustained. The case then proceeded to trial on the equity issue, as against the defendant C. H. Groves alone, P. C. Holdoegel not being involved in said trial nor in this appeal.

There was a trial, at which a large number of witnesses testified and a great volume of testimony was taken. The lower court found that the settlement was obtained without fraud, misrepresentation, or concealment by C. H. Groves, and that the compromise pleaded by him was a complete settlement of plaintiffs' cause.

The plaintiffs being dissatisfied with the holding have appealed to this court.

This cause of action grew out of the "land boom" days of 1919 and 1920. That period in the history of Iowa when land was selling at $250 to $400 per acre. It was followed a few years later by what is now known as the depression years, when the sale prices of the same land that sold at the boom prices dropped to a small fraction of its former price. The bottom of that depression was reached in 1932. In the consideration of this case there must be kept in mind the difference in value of land between what men of experience and training believed farm land to be worth in 1919 and 1920 and the years 1930, 1931, and 1932.

In June of 1919, C. H. Groves together with P. C. Holdoegel and J. H. Bradt (now deceased) purchased from Catherine

Bradford and her husband, S. C. Bradford, a 651-acre farm in Buena Vista county, Iowa, known as the "Grass Lake Ranch", for a consideration of $162,750.

They paid a little over $8,000 at the execution of the contract, and a little over $24,000 on March 1, 1920, the day the deed was delivered. In addition they assumed a first mortgage of $62,000 and executed a second mortgage to Catherine Bradford on this farm for the balance in the sum of approximately $68,200.

Shortly thereafter, Groves, Holdoegel, and Bradt sold the Grass Lake Ranch to a T. J. Caskey at a supposed profit which was represented by a third mortgage in the sum of $13,757. Caskey assumed and agreed to pay the first and second mortgages on the farm. Caskey sold the farm to Erma Erichsen and Amelia Braasch, who assumed and agreed to pay the first, second, and third mortgages.

These last purchasers were unable to keep up the taxes on the farm and the interest on the three mortgages and in June 1925 deeded the farm back to Groves, Holdoegel, and Bradt in settlement of the third mortgage which was believed to have been profit at the time of the sale of the farm by Groves et al., to Caskey.

Groves, Holdoegel, and Bradt held the farm for a few years reducing the first mortgage from $62,000 to $50,000 and the second mortgage from $68,200 to $58,157 and in addition put several thousand dollars worth of improvements upon the farm.

In 1922 Catherine Bradford and her husband became quite heavily involved financially with the Brentons, who are bankers at Dallas Center and who are the main owners of the Dallas Real Estate Company. The Bradfords transferred and assigned considerable property to the Brentons, including the second mortgage on the Grass Lake Ranch, in settlement of their obligations.

In 1926 the second mortgage on the Grass Lake Ranch was renewed by executing nine promissory notes, three of

them the notes involved in this case, were signed by C. H. Groves as maker and endorsed by Holdoegel and Bradt, three others were signed by Bradt as maker and endorsed by Holdoegel and Groves, and three were signed by Holdoegel as maker and endorsed by Bradt and Groves. The total amount was $58,157.88. These notes were given to W. H. Brenton, and were secured by a second mortgage on the Grass Lake Ranch. This mortgage was subject to the first mortgage, which was originally $62,000, but had been reduced to about $50,000.

In 1932 W. H. Brenton assigned all nine of the notes to the Brenton Real Estate Company. It is conceded that the Brenton Realty Company, Brenton Real Estate Company, Dallas Real Estate Company, and W. H. Brenton are one and the same thing.

In the operation of these various companies, the Brentons who were the real owners, employed one D. E. Neville. It is conceded that he had authority to do everything he did in this case.

Conditions in Iowa grew gradually worse. It was impossible out of. the income on the farm to pay the interest on these two large mortgages and the taxes, and in 1931, Groves and Holdoegel (Bradt having died) entered into a written agreement, called in the record "Agreement for the appointment of a receiver", for the Grass Lake Ranch. The agreement was with W. H. Brenton, and it provided that D. E. Neville was to be the receiver, to rent, operate, and collect the income from the farm.

The agreement sets out that there is a first mortgage of $50,000 on the land, that it was to run for a period of one year, and that suit on the notes or foreclosure of the mortgage held by Brenton was not to be commenced for a period of one year. Neville acted as receiver for a period of three years, and during that time collected the rents and income, paid the first half of the 1931 taxes, and turned over to Brenton the rest of the money collected, the amount not being shown.

In March of 1932, Neville wrote Groves a letter in which he said that the matter should be "cleaned up".

We quote from the letter:

"In figuring over the deal with the amount due on your notes, together with interest, I believe that if you could arrange to put up $25,000 in cash or securities, we would be willing to make a final settlement on the basis of that amount. Of course, this amount would be less your share of the income we have received from the farm and your share of the Erichsen chattel mortgage which would be deducted."

Groves replied that he would be glad to cooperate "if some adjustment could be reached within my ability".

Neville also wrote to Holdoegel about a settlement. Holdoegel did not reply. Groves then saw Holdoegel and wrote Neville. We quote from his letter:

"Mr. Holdoegel said he had received your letter, but the reason of delay in answering it was the fact that your figures 'knocked him off the Xmas tree' and that he saw but little use in answering."

Mr. Neville had according to his testimony several talks with Groves in Cherokee. That Groves said he could not raise any money.

Either in March or April 1932, Neville and another employee of the appellants by the name of Kelley, went to Cherokee and looked up the records in the county recorder's office. That they found recorded on the Groves Lake Farm a first mortgage of $30,000, a second mortgage of $14,160 and a third mortgage of $9,280. That on the same day they talked to Groves, but did not ask him about these mortgages or any of his other property. That he said he could raise no money except on his home.

On June 3, 1932, Neville wrote Groves asking him to meet him at Rembrandt. On the 9th of June, Neville and Groves met at the Grass Lake Ranch, why they should pick the farm that had caused all the trouble for the meeting place to reach an agreement of settlement does not appear in the record. In

June of 1932, with the conditions that then prevailed in the agricultural industry well known to both Neville and Groves, the land that they were gazing at, had little value to either one.

It is not disputed but that Neville and Groves reached an agreement of settlement on that day, for on the following day, June 10, 1932, Neville wrote Groves confirming the settlement. Under the terms of the settlement; Groves was to assign certain leases, he was to give a chattel mortgage on about $2,000 bushels of corn on another farm that appellants had no claim to, and in addition he was to pay the sum of $1,000. Appellants were to return the notes to Groves. Groves assigned the leases, executed and delivered the chattel mortgage on the corn and paid the sum of $1,000. This was acknowledged by the appellants, and they wrote Groves a letter that the whole matter had been settled, and that it was a "final settlement of the claims held by W. H. Brenton against yourself and Mrs. Groves".

Appellants did not return the notes, claiming that they desired to hold them until the question of their holding the crops on the land had been settled with the owner of the first mortgage. There was correspondence between Groves and Neville from 1932 to 1938, mainly about the return of the notes. Mr. Neville in one letter said that he appreciated how Mr. Groves had cooperated with them, but that Holdoegel had not.

The fraud which appellants complain of was not discovered by them, they claim, until 1938, and this action was brought a few months later.

It is the claim of appellants that Groves concealed certain of his property, which had they known about they would not have made the settlement. Later in this opinion we will discuss in detail the claims of the appellants as to the alleged concealed property.

In the case of Stock v. Christle, 151 Iowa 238, 242, 130 N. W. 1074, 1075, this court speaking through the late Justice Weaver said:

"When a plaintiff comes into court with a stale claim on which he asks to have an amicable settlement set aside and to

recover money voluntarily paid to his creditor, it is but just that he be required to establish his case by a clear and satisfactory preponderance of evidence. Hervey v. Savery, 48 Iowa, 313; Clute v. Frazier, 58 Iowa, 268 [12 N. W. 327]; Strayer v. Stone, 47 Iowa, 333; Wachendorf v. Lancaster, 61 Iowa, 509 [14 N. W. 316, 16 N. W. 533]; Hunt v. Gray, 76 Iowa, 268 [41 N. W. 14]; Sauer v. Nehls, 121 Iowa, 184 [96 N. W. 759]. The burden of proof is heavily upon a plaintiff who seeks to set aside a settlement of an account or claim. Ball v. McGeoch, 81 Wis. 160 (51 N. W. 443); Currey v. Lawler, 29 W. Va. 111 (11 S. E. 897); Marsh v. Case, 30 Wis. 531; Phillips v. Belden, 2 Edw. Ch. (N. Y.) 1; Chubbuck v. Vernam, 42 N. Y. 432. To quote the language of Chief Justice Marshall: 'No practice could be more dangerous than that of opening accounts which the parties themselves have adjusted, on suggestions supported by doubtful or only probable testimony.' "

In the very recent case of Kilts v. Read, 216 Iowa 356, 364, 249 N. W. 157, 161, speaking through Justice Anderson this court said:

"The testimony of the plaintiff as to the fraud and misrepresentations alleged is controverted in the record by equally credible testimony.

"We quote from the case of Johnson v. Tyler, 175 Iowa 723, 157 N. W. 184, 187:

" 'It is also well settled that the court will not grant relief on the ground of fraud unless the fraud alleged and relied upon, and which if proven would justify the court in doing so, is established by clear, convincing, and satisfactory evidence.' See, also, Epps v. Dickerson, 35 Iowa 301; Ley v. Metropolitan Life Ins. Co., 120 Iowa 203, 94 N. W. 568.

"A mere preponderance of the evidence is not sufficient. Edmunds v. Ninemires, 200 Iowa 805, 204 N. W. 219; Clark v. Beck, 208 Iowa 156, 225 N. W. 353.

"Fraud is not presumed. And in this class of cases, especially where title to real estate is involved, it must be established by clear, convincing, and satisfactory evidence. Schrimper

v. C., M. & St. P. R. R. Co., 115 Iowa 35, 82 N. W. 916, 87 N. W. 731; Harvey v. Phillips, 193 Iowa 231, 186 N. W. 910; Edmunds v. Ninemires, supra; Epps v. Dickerson, supra; Johnson v. Tyler, supra.

"We are not satisfied that there is any proof in the record that the settlement effected by the contract was not a fair and meritorious one under all the facts and circumstances shown. At least the plaintiff seems to have been satisfied with it for several months, and until he was solicited, or at least conferred with, and advised by attorneys from Minneapolis. And following such conferences the present litigation was commenced."

With these rules of law in mind, we turn to the record to ascertain the facts.

This is not a case in which some inexperienced individual was taken advantage of. D. E. Neville is a man of years of experience in banking and business matters. He had a good education, he had experience in real-estate business. He knew land values; he had been employed as cashier of a bank. He was for several years in the liquidating department of the state of Iowa banking department. He was employed by the Brentons, who have for years been operating large banks, and real-estate interests. Groves on the other hand was a man of limited education and experience in the business world. He operated farms and dealt to his regret in real estate. In business experience and training Neville was far superior to Groves.

The appellants were the aggressors in bringing about the settlement. No doubt it was to their advantage in June 1932 to get what they could out of what looked at that time as a hopeless mess.

According to appellants' figures, Groves, Holdoegel, and Bradt were indebted to them at that time, in about the sum of $100,000 and yet without any investigation as far as this record shows, they were willing to settle for the sum of $25,000, less the amount they had collected from the rents and income on the farm. Just what that amount was does not appear in the rec-

ord, but under the settlement made, they received a little better than $11,000 and it is fair to assume that from the lands they collected rents from they received several thousand dollars which would reduce the amount they originally offered to settle for.

There are a great many letters in the record written by appellants and in none of these is there a request for a statement of Mr. Groves as to what property he owned or how much he owed.

The settlement took place out at the Grass Lake Farm, the place being the choice of Mr. Neville. Only Mr. Groves and Mr. Neville were present, yet there is little dispute between them as to what took place.

Neville does not claim that he ever asked Groves what property he had or how much he owed, nor does he claim that Groves ever told him anything about his property or his indebtedness on that June afternoon. Neville says that Groves said he could not raise any money and Groves says that Neville asked him if he could not raise $2,000 or $3,000 by mortgaging his home. Groves said he would assign certain leases, that he had 2,000 bushels of corn on another farm that appellants had no claim against and that he would give Neville a chattel mortgage on this corn and that he believed he could raise $1,000. That this was the settlement is proved by the fact that on the next day Neville wrote Groves referring to the settlement. That Groves assigned the leases, forwarded the chattel mortgage on the corn and paid the $1,000 and received from Neville a written acknowledgment of final settlement of the claims of the Brentons against Groves and his wife.

In view of such a situation, it is hard to see how under these circumstances Neville could claim fraud in the securing of the settlement.

But let us look at the property claimed to be concealed.

Groves was the owner of what is known as the "Deer Farm". It consisted of 600 acres. There were recorded against this farm three mortgages, one of $30,000 to the Cherokee bank,

one of $14,000 to Perry Boughton, and one to C. W. Graves for $9,000. Groves owed the Cherokee bank on unsecured notes about $30,000. It is his claim and there is evidence that after the giving of the mortgage to Boughton he borrowed money from him. Groves sold to one Lauer 400 acres of land in 1919 for $200 an acre. He took back a big mortgage and later Lauer borrowed from an insurance company $24,000 on his farm and paid it to Groves. Groves paid the money to the Cherokee bank. It is the claim of the appellants that they knew nothing about the Lauer deal. But they never asked Groves one single question about his property. The evidence also shows that in June 1932 the Deer farm was not worth in excess of $25,000, that it was 600 acres and hard to sell, that the mortgage of $30,000 to the Cherokee bank was more than it was worth, and that the bank took it because they had already made the loans. The Lauer farm with $24,000 mortgage against it had little if any equity in it in 1932. We must keep in mind that we are talking of values of real estate at the very depth of the depression, and this court is well aware of the situation that prevailed in 1932. The appellants in this case also knew of the condition that prevailed in 1932. Mr. Neville testified that in his judgment the Grass Lake farm, which Groves, Holdoegel, and Bradt paid $250 for in 1919, was worth only about $75 an acre in June 1932. There is of course a difference in opinion as to the value of the real estate involved in this case, but as the writer of this opinion reads this record, with full knowledge of conditions in 1932, I can come to no other conclusion than that there was little if any equity in the lands owned by Groves.

Then besides this these appellants received from Groves a financial statement as to his property in 1926, when the mortgage was renewed. It listed his property including 1,026 acres of land and interests in two other farms. He showed a net worth of over $250,000, practically all of it in land and mortgages, and only $1,100 cash on hand. With this knowledge as to Groves' property, this appellant never asked Groves one word about his property. They complain that he had bank stock.

Yes, the property statement the appellants had showed the bank stock, but this was in June 1932, when banks were closing daily. No one wanted bank stock because there was a double liability. Appellants knew of this bank stock, but never asked about it. Groves did not conceal it, he had placed it in the property statement he gave to the appellants.

They complain that Groves did not tell them that he owned a half interest in certain stock and equipment used in operating the 600-acre farm. Again we find that Neville did not ask Groves, nor did Groves say anything about it. The property statement which appellants had listed certain cattle and hogs and yet no inquiry was made in regard to personal property. The record shows that in 1932 Groves lost in the operation of his farm the sum of over $3,500. Hogs and cattle were of little value in June of 1932, and the appellants knew that fact only too well.

Then appellants complain about some Dakota land which they say Groves owned. Again no one asked him about it. Whether it was listed in the statement of 1926 or not does not appear in the record. Its value, if any, in June 1932, was very little.

This is a case in which the appellants, outstanding bankers and businessmen in Iowa, accuse this small real estate man and farmer of fraud in securing this settlement. The burden is upon the appellants. Courts do not like to set aside settlements made seven years before unless there was fraud, which has been proved by clear and convincing evidence.

Appellants had in their possession a property statement duly signed by C. H. Groves. It listed assets as cash of $1,100; contracts and mortgages of $103,763; hogs and cattle of $3,800; bank stock of $2,150; real estate of over $220,000; and a home of $11,000. It listed indebtedness of $92,000, showing a net worth of $252,678. With this information in the possession of the appellant these bankers never asked Groves one single question about this property which he had listed, nor did Groves make a single representation to these appellants as to the property he possessed. Appellants did not want real estate.

They did not want hogs, cattle, and machinery. They did not want bank stock in June of 1932, when this settlement was made because they knew only too well there was little if any value in any of these items.

What appellants complain of is, that Groves said he could not raise any money, that $1,000 was all he could raise. There is no evidence in this record that Groves could have raised any considerable amount of money in June 1932. Banks and insurance companies were not loaning money in June 1932. It made little difference what security you had, the banks in Iowa needed all the money to pay their depositors, who were rapidly withdrawing their money. This situation was known to all, but none better than the Brentons, who were operators of banks.

In June of 1932, Groves was indebted to the Cherokee bank in a large amount. What the total amount of indebtedness was that Groves owed in June 1932 is not actually shown in the record but it would easily total the amount of $200,000, and all he had to pay this huge amount with was real estate, a little farming equipment and 10 shares of bank stock. It is hard to conceive of how this man in June of 1932 could have raised any considerable amount of money, and certainly this record fails to show that he could.

There was a cross-petition filed by C. H. Groves praying that the court enjoin the appellants from assigning or suing upon the other notes growing out of this same transaction. The notes are known as Exhibits 6 to 11, both inclusive. These notes were part of the same deal involved in the case at bar, and it necessarily follows that the lower court was right in granting the relief prayed for in the cross-petition.—Affirmed.

CHIEF JUSTICE and all JUSTICES concur.

---

CONJUNCTIONAL OPINION.

FEBRUARY 6, 1940.

Edson & Edson and Lew McDonald, for appellants.

Miller, Miller & Miller and Donald Holdoegel, for appellees.

MILLER, J.—This is a suit on certain promissory notes held by the plaintiffs. The defendants filed answer alleging a compromise settlement pursuant to which the liability of the defendants was satisfied. Plaintiffs filed a reply asserting that the settlement was obtained by fraud and, accordingly, does not constitute a defense to such notes. The case is one in equity. The decree of the trial court adjudged that there was no fraud in the making of the settlement, that the plaintiffs were guilty of laches and were guilty of concealment in regard to the settlement. The court further found:

"That the compromise and settlement made between the plaintiff and the defendant, C. H. Groves, upon the 9th day of June, 1932, constituted a settlement of all of the claims held by the plaintiffs against the defendant, and that included in these claims, in addition to Exhibits 'A,' 'B' and 'C' herein sued upon, were other promissory notes which have been introduced and identified in this record as Exhibits '6' to '11,' both inclusive, and Exhibit '32', and that the defendant, C. H. Groves, is entitled to an injunction restraining the plaintiffs from bringing suit upon said Exhibits or any other claims held by plaintiffs against said defendant."

The decree further provided:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the

plaintiffs and each of them, be and are hereby forever enjoined and restrained from bringing any further action, suit or proceedings against the defendant, C. H. Groves, for any and all alleged obligations held by either of the plaintiffs against said defendant, C. H. Groves, and said plaintiffs are further enjoined from instituting any suit, action or proceedings against the defendant upon any or all of the promissory notes signed or endorsed by the defendant, C. H. Groves, which were introduced and identified in this case as Exhibits '6', '7', '8', '9', '10', '11', and '32', and said plaintiffs are further forever enjoined and restrained from assigning said notes to any other parties.''

The appeal from this decree is now set for submission before this court at the March, 1940, period. Pending such submission, appellants have filed a motion for modification of the decree and a stay of those provisions thereof which enjoin the appellants from instituting any suit, action or proceedings on the promissory notes which were not sued upon herein, but were identified as Exhibits 6, 7, 8, 9, 10, 11 and 32. The basis for such application is that all of said promissory notes were due and payable March 1, 1930. Unless such a stay is granted, the statute of limitations will have run against all of such notes before the appeal is submitted in this court and, in the event of a reversal, appellants would be deprived of legal rights accorded by such reversal, and would be deprived of the fruits of their victory in this court.

We are of the opinion that the application for temporary modification of decree and stay of proceedings, herein specified, is well grounded and should be granted.

It Is Therefore Ordered: That the provisions of the decree of the district court of Cherokee county herein appealed from is temporarily modified and stayed insofar as the same enjoins the appellants from instituting any suit, action or proceedings on the promissory notes introduced and identified in this case as Exhibits 6, 7, 8, 9, 10, 11 and 32. Appellants are granted the right to commence such proceedings as they deem

necessary or desirable to establish liability on such promissory notes, but are enjoined and restrained from bringing such suits, actions or proceedings on for trial prior to the final determination of this appeal by this court.

HAMILTON, C. J., and STIGER, HALE, and BLISS, JJ., concur.